**Charles C. SMYTH and Greg Smith, Plaintiffs,**

**v.**

**Arend LUBBERS, President of Grand Valley State Colleges, individually and in his official capacity, et al., Defendants.**

**No. G74–46–C.A.**

United States District Court,
W. D. Michigan, S. D.

June 27, 1975.

H. David Soet, Grand Rapids, Mich., of counsel, Pinsky & Soet, Grand Rapids, Mich., William Burnham, G. R. Legal Aid Society, Grand Rapids, Mich., for plaintiffs.

Law, Weathers, Richardson & Dutcher, Grand Rapids, Mich., David E. Dutcher and Patrick W. Muldoon, Grand Rapids, Mich., of counsel, for defendants.

## OPINION

FOX, Chief Judge.

The five original plaintiffs in this case were students at Grand Valley State Colleges in Allendale, Michigan [hereafter referred to as the College], during the 1973–74 academic year. All resided in dormitory rooms on campus. On January 30, 1974, College officials acting under color or authority of College regulations, searched each of the plaintiffs' rooms without warrants, and discovered substances alleged to be marijuana. On February 14, 1974, the students filed suit with this court under 42 U.S.C. Sec. 1983 and 28 U.S.C. Sec. 1343 challenging the validity of the regulations and searches, and raising due process objections to the disciplinary action they felt sure would follow. Although Grand Valley State Colleges was originally a defendant, it has been dismissed as a party by stipulation. The present defendants are individual executive officers and employees of the College.

This court issued a Temporary Restraining Order on February 14, 1974, which restrained the College from executing any sentence or punishment it might impose, pending adjudication of plaintiffs' constitutional claims, but which otherwise allowed the College administrative process to go forward. The cases of all but two of the original plaintiffs were finally disposed of inside the administrative process, and are no longer before this court.

However, as more fully set forth below, the plaintiffs Charles C. Smyth and Greg Smith were found guilty of possession of marijuana by the All College Judiciary and suspended. The plaintiff Smith requests a judgment declaring that the search in question was illegal and unconstitutional, and a permanent injunction prohibiting the defendants from expelling or suspending him from the College on the basis of any evidence discovered in the course of the search, or the fruits thereof. He also seeks an injunction requiring defendants to expunge from the College records any reference to disciplinary action based upon illegally seized evidence or the fruits thereof.[1] Both Smith and Smyth request judgments declaring that hearing procedures employed by the College failed to accord them due process as required by the Constitution. They request injunctions restraining the defendants from expelling or suspending them from the College based upon these hearings.

The parties have entered into extensive stipulations as to facts and exhibits, and have submitted the case on stipulated issues. They have also agreed that no hearings are necessary, and, to the extent that the stipulations might not cover all material facts, the court may use the exhibits, the transcript of the All College Judiciary hearing, and the depositions on file. The Temporary Restraining Order has been extended by stipulation.

A summary of the stipulated facts and issues follows. The court will find additional facts as necessary in the course of its discussion of the legal issues.

Grand Valley State Colleges publishes and distributes a Student Handbook setting forth in some detail the College rules and regulations. One such regulation pertains to drugs: "The possession,

---

1. The First Amended Complaint requested relief relative to the search and seizure for both plaintiffs. However, because the Chairperson of the All College Judiciary suppressed the evidence seized from Smyth's room, his claim for relief relative to the search and seizure of the alleged marijuana has become moot.

distribution or use by a student of any narcotic or hallucinogenic drugs, including marijuana, in either the refined or crude form except under the direction of a licensed physician is prohibited." Student Handbook, at 21. The College also has a Disorderly Conduct regulation which provides, in part, "No person shall engage in intentional expression or conduct on College owned or controlled property or at College sponsored or supervised functions which substantially disrupts or interferes with the rights of others, College discipline or normal College functions, or which causes substantial disorder." Student Handbook, at 19. There is no contention that the plaintiffs were not aware of these regulations.

On January 30, 1974, Smyth and Smith were living in room 269 and 265, respectively, in Kistler Hall on the College campus. Each has signed a "Residence Hall Contract" which provided, in part: "The undersigned, in consideration for the board and room provided by Grand Valley College, do(es) hereby agree as follows: . . . (2) To abide by the terms and conditions of residence in Grand Valley State College residence halls as stated in the current housing handbook, which terms and conditions are specifically made a part thereof [sic.]. (3) That residency in Grand Valley State College residence halls, and this contract, are subject to all rules and regulations of Grand Valley State College." Stip. Ex. No. 2.

The College's Room Entry Procedures which were in effect at all times pertinent to ths case, and which applied to the plaintiffs' dormitory rooms, provided:

ROOM ENTRY PROCEDURES. In the interest of maintaining an environment in the College residence halls, which provides for the health, safety, and welfare of all residents, it is occasionally necessary for the College to exercise its right of room entry. The situations requiring room entry are as follows:

1. Authorized college personnel may enter student rooms at reasonable times for purposes of maintenance.

2. Student rooms may be entered by residence hall staff members if any of the following situations exist:

a. A clear indication that established health or safety regulations are being violated.

b. There is a clear and present danger to the room occupants or other residents.

c. College officials have reasonable cause to believe that students are continuing to violate federal, state or local laws or College regulations, the room is subject to search by College authorities. A search will be conducted reluctantly and only if authorized by the GVSC President or a designee.

3. Student rooms may be entered and searched by county and state officials only after a search warrant has been presented stating the reason for the search.

Student Handbook at 23–24.

On January 30, 1974, at about 12:45 A.M., the plaintiffs' rooms were entered and searched pursuant to the College regulations and under the authority of the College Room Entry Procedures Rule 2(c). The rooms were entered and searched by Defendant Douglas Ballard, Resident Advisor of the College; Defendant Karen Nemen, Head Resident Assistant; Defendant Brad Jones, then Director of Housing of the College; Officer Al Wygant, a campus policeman and Ottawa County Deputy Sheriff; and Officer Grant Schliewe, also a campus policeman and Ottawa County Deputy Sheriff. No consent was given to the searches, and the searches were conducted without a warrant. Evidence was seized in both searches. Stip. Ex. Nos. 5, 6; Stipulation Nos. 7, 12, 17.

After the search, the plaintiffs were charged with "disorderly conduct and possession of narcotic drugs in violation of both State of Michigan laws and/or

Grand Valley State Colleges regulations." Stip. Ex. Nos. 8, 9.

The plaintiffs chose to be tried by the All College Judiciary. That panel was composed of seven members, including four students, two faculty members, and one administrator. The Chairperson, Ms. Rhonda Rivera, is an attorney. At the hearings, the plaintiffs were represented by counsel, given an opportunity to cross-examine witnesses, and to present witnesses and evidence in their own defense. The College was also represented by counsel, who acted as prosecutor.

Both plaintiffs challenged the admissibility of the evidence seized as a result of the January 30 search of their rooms. With the consent of counsel, the Chairperson of the All College Judiciary, sitting alone, conducted a separate hearing on the admissibility of the evidence under the College regulations. The Chairperson did not consider the plaintiffs' constitutional challenge. The evidence seized from Smith's room was ruled admissible as to him. The evidence seized from Smyth's room was ruled inadmissible.

At Smith's hearing before the full Judiciary, Officer Wygant stated that during the search of Smith's room he discovered three baggies containing a substance which he identified as marijuana. A pipe was also found which "contained," in the words of the parties' stipulation, "a very characteristic smell." Smith was found guilty of possession of marijuana and was suspended from the College for one term. He was acquitted on the charge of disorderly conduct.

Notwithstanding the suppression of the alleged marijuana in his case, the Judiciary found Smyth guilty of possession of marijuana on the basis of testimonial evidence and he was suspended from the College for a period of two years. He likewise was acquitted of the charge of disorderly conduct.

No criminal proceedings have been instituted by the College or civil authorities against the plaintiffs.

The parties have submitted the case for the decision of this court on nine stipulated issues. These fall into three major categories. The first two issues concern jurisdiction. Issues three through six concern the validity of the College Room Entry Procedures and the search and seizure. Issues seven through nine raise due process questions concerning the hearings.

I.

Stipulated Issues 1 and 2 are closely related, and will be treated together. Stipulated Issue No. 1 is as follows: "Do the Civil Rights Acts (28 USC 1343 and 42 USC 1983) confer federal jurisdiction over the individual defendants in this action, or, are these individual defendants, when acting in their representative capacities on behalf of the College in reality the College itself and not 'persons' acting under color of any statute, ordinance, regulation, custom or usage of any State, such that the Court is without jurisdiction over the individual defendants under the said statutes?" Stipulated Issue No. 2 is as follows: "Does the Eleventh Amendment to the United States Constitution bar this injunctive action under 42 USC 1983 and under 28 USC 1343 against state college officials who, acting in their representative capacity, ordered or conducted the search of plaintiff Smith's room or brought college disciplinary actions against both plaintiffs?"

Grand Valley State Colleges is a publicly created and publicly financed institution of higher education under the general supervision of a Board of Control. M.C.L.A. Sec. 390.841 (Supp. 1975–1976). The defendants are executive officers and employees of the institution, and are being sued in their representative and individual capacities. They contend that they are not "persons" within the meaning of 42 USC

Sec. 1983. They contend that they are in reality joined only in their representative capacities, and may be sued individually only for some sort of "ultra vires" conduct beyond the scope of their employment.

It is elementary that a party stating a claim under the Fourteenth Amendment and its implementing statutes, including 42 U.S.C. Sec. 1983, must allege official or state action, as distinguished from purely private action. Here, the plaintiffs complain of actions taken by the College officers and employees under color of law in their representative capacities. Such allegations are necessary to, and do, state a claim upon which relief can be granted under Sec. 1983.

 When Congress passed the Civil Rights Act of 1871, including the antecedent of the present 42 U.S.C. Sec. 1983, it did not intend to subject states, counties, and municipalities to direct suit. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Instead, it adopted a fiction which had been created long before the enactment of the Fourteenth Amendment. An official action which is found to have violated constitutional rights is deemed "ultra vires", beyond the official's authority because the state cannot lawfully authorize its officials to violate the constitution. Thus, under Sec. 1983, any person who, under color of law, deprives another of his federal constitutional rights, is liable to the injured party at law or in equity. If a person acts under color of law, it is irrelevant whether the official was acting within or without the scope of his employment by common law standards. See Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

 The court concludes that the defendants are "persons" within the meaning of 42 U.S.C. Sec. 1983, and that the pleadings and stipulations establish that they were acting under color of law within the meaning of Sec. 1983 in performing the actions complained of by the plaintiffs. See Gay Students Organization of Univ. of New Hampshire v. Bonner, 509 F.2d 652 (1st Cir. 1974). Accordingly, the court finds that it has jurisdiction under 28 U.S.C. Sec. 1343.

 For similar reasons, the grant of relief in this case is not barred by the Eleventh Amendment. Although it might be held that the Fourteenth Amendment, which by its terms limits states, pro tanto repealed the Eleventh, the Supreme Court has consistently held that an individual state official may be sued to vindicate federal constitutional rights, at least so long as the judgment does not call for a compensatory payment from the state treasury. Ex parte Young, supra; Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In this case, the plaintiffs are seeking only injunctive relief.

## II.

Stipulated Issues 3, 4, 5, and 6 relate to the search of Smith's room, the seizure of the alleged marijuana, and its admission in the College disciplinary hearing. Issues 3 and 5 are so closely related that they ought to be discussed together.

Stipulated Issue No. 3 is as follows: "For purposes of a college disciplinary proceeding, may state college officials pursuant to a published college regulation search a student's rented dormitory room without a search warrant if the officials have reasonable cause to believe the student is violating federal or state laws or college regulations, or, must the officials obtain a search warrant based upon probable cause?"

Stipulated Issue No. 5 is as follows: "Assuming the college's room search regulation was constitutional and reasonable, does a college student who lives in a dormitory on campus which he 'rents' from the college waive objections to any reasonable searches of his room conducted pursuant to such college regulation?"

It is important at the outset to note what this case does not involve. There is no challenge to the substance of the College regulation prohibiting the possession, distribution, or use of marijuana on the campus. Indeed, it is axiomatic "that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct." Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8th Cir. 1969), cert. denied 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970), quoted with approval, Healy v. James, 408 U.S. 169, 192, 92 S. Ct. 2338, 33 L.Ed.2d 266 (1972). There is no question of "immunizing" any conduct whatsoever. The Fourth Amendment does not prevent all searches, but only constitutionally unreasonable ones. The Fourth Amendment never forbids prosecution for an alleged offense. There is no question here of entry or inspection of rooms for strictly health or safety reasons.

■ If it is axiomatic that school officials have inherent power to promulgate and enforce regulations, it is also axiomatic that this comprehensive authority must be exercised consistently "with fundamental constitutional safeguards." Tinker v. Des Moines School District, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); see also, Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Students have constitutional rights which must be respected. Students are no longer members of what Graham Greene's Secret Police Captain Segura called the "torturable class."[2]

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The resolution of Stipulated Issues 3 and 5 requires the essential Fourth Amendment inquiry into the "reasonableness" of the search and seizure in question, and the way in which that "reasonableness" derives content and meaning through reference to the warrant clause. See United States v. United States District Court, 407 U.S. 297, 309–310, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Coolidge v. New Hampshire, 403 U.S. 443, 473–484, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). This in turn requires a careful identification and weighing of the respective interests of the plaintiff and the College in light of the Fourth Amendment, since the specific content and incidents of the Fourth Amendment right of privacy are shaped by the context in which the right is asserted. Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[3]

The focus of the initial inquiry is whether the plaintiff Smith had a "reasonable expectation of freedom from governmental intrusion," Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968). Smith was an adult at the time of the search in question, and thus was in general entitled to the same rights of privacy as any other adult in our society. In this, Smith was no different from the vast majority of Michigan college students.[4] These students are in a different position from most elementary

---

2. Our Man in Havana, in Triple Pursuit! A Graham Greene Omnibus (1971) at 376.

3. It is stipulated that there was no warrant for and no consent to the search in question. There is no suggestion that there were "exigent circumstances" justifying the search.

4. Smith had just turned 21 years of age on the date of the search. The Michigan Age of Majority Act of 1971 provides that any person attaining 18 years of age "is deemed to be an adult of legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, rights and legal

and secondary school students who are minors and are presumptively subject to a greater degree of supervision.

■ The place which was searched was Smith's college dormitory room. Smith had signed a Residence Hall Contract for the 1973–74 academic year. Presumably, Smith, as other students, resided in his room full time during the school, except for short vacations. His room is deemed his residence by the State of Michigan for voting purposes. Mich.Const. of 1963, Art. II, Sec. 1; Wilkins v. Bentley, 385 Mich. 670, 189 N.W.2d 423 (1971); M.C.L.A. Sec. 168.-11(a). The plaintiff's dormitory room is his house and home for all practical purposes, and he has the same interest in the privacy of his room as any adult has in the privacy of his home, dwelling, or lodging. Because of the material and psychological importance of a man's home, the college dormitory room is not in the least like a licensed business establishment. Cf., United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L. Ed.2d 87 (1972).

The Fourth Amendment by its terms protects "houses." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," United States District Court, supra, 407 U.S. at 313, 92 S.Ct. at 2134, and it is established that the privacy protected by the Fourth Amendment is a fundamental constitutional right. Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). The plaintiff's interest in the privacy of his room is not at the "outer limits" as the College argues, but on the contrary is at the very core of the Fourth Amendment's protections.[5]

■ In assessing the existence and scope of the right to privacy in any particular case, the nature of the governmental intrusion is a factor to be weighed. Because the Fourth Amendment, unlike, for example, the Sixth, is not limited to criminal prosecutions, it applies to "all alike, whether accused of crime or not," Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914); see also, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746 (1886) (forfeiture proceeding); One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L. Ed.2d 170 (1965) (forfeiture proceeding), and it is not necessary to take the "wooden approach" of formally characterizing the College proceedings as either "civil" or "criminal." See McKeiver v. Pennsylvania, 403 U.S. 528, 541, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). But it is necessary to make a determination as to the relative hostility of the intrusion in this case. In Camara v. Municipal Court, the Supreme Court found that a routine annual inspection for possible violations of the San Francisco housing code was "a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime," 387 U.S. 523, 530, 87 S. Ct. 1727, 1731, 18 L.Ed.2d 930 (1967), and this determination affected the application of the Fourth Amendment.

■ This case clearly involves a full search which focused upon the room of a specific individual who was suspected of criminal activity, and which aimed at discovering specific evidence. The search was not "administrative" in the sense of a generalized or routine inspection for violations of housing, health, or other regulatory code. See People v. Dajnowicz, 43 Mich.App. 465, 204 N.W. 2d 281 (1972).

capacity as persons heretofore acquired at 21 years of age." M.C.L.A. Sec. 722.52 (Supp. 1975–1976). Nationally, it is reported that the student group beyond the usual 18-to-22-year-old range is the fastest growing segment in higher education and makes up 48 per cent of the total college enroll-

ment of 10 million. New York Times, April 20, 1975, at E9, col. 1.

5. Compare Moore v. Student Affairs Committee of Troy State University, 284 F.Supp. 725 (M.D.Ala.1968).

Since the College authorities were looking for marijuana in Smith's room, the search was specifically for instrumentalities of crime, defining "instrumentalities" here as contraband. It is a misdemeanor to possess marijuana under federal law, 21 U.S.C. Secs. 812(c), 844(a) and Michigan law, M.C.L.A. Secs. 335.305(3), 335.314(c), 335.341(4). The College regulation against possession of marijuana merely tracks federal and state law. The College regulation under which the search was conducted makes no distinction based on the source of law, but says that College may conduct a warrantless search on reasonable cause to believe that there are continuing violations of "federal, state *or* local *or* College regulations." (Emphasis added.)

█ Although the Fourth Amendment applies whether or not the "police" conduct the search, see, e. g., Boyd, supra; Camara, supra; Air Pollution Variance Board v. Western Alfalfa Corp., 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974), in this case the plaintiff's room was searched by, among others, two campus police officers who were also Ottawa County Deputy Sheriffs.

While the court will not characterize the charge, conviction, and one-term suspension of Smith as a formal "criminal proceeding," the College proceedings certainly performed all the functions of a criminal action. The object of a college disciplinary proceeding relating to the possession of marijuana, like a criminal proceeding, is to penalize for the commission of an offense against the law.[6] See One 1958 Plymouth Sedan, supra, 380 U.S. at 700, 85 S.Ct. 1246. To the extent suspension can be said to teach the student that he should not violate the rules, any criminal sanction accomplishes the same educational objective.

█ Moreover, contrary to the defendants' implicit assumption, the Col-

lege's resort to its own internal proceedings will not insulate either the College from the intrusion of civil authorities into its affairs or Smith from the institution of formal criminal proceedings against him. The matter is entirely outside the control of the College, and the search and seizure in question puts Smith in severe jeopardy. The Michigan Controlled Substances Act provides that marijuana "shall be seized and summarily forfeited to the state." M.C.L.A. Secs. 335.355(1)(a), 335.355(6). The Attorney General may bring an action against the College for the recovery of the marijuana. M.C.L.A. Sec. 600.4541. The marijuana may, perhaps, be used against Smith in a formal criminal proceeding, either to prove guilt directly, or to impeach his testimony even if it cannot be used to prove guilt. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L. Ed.2d 1 (1971). In any event, the seized marijuana can be the basis of state or federal grand jury questions directed to Smith (or any College official). United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

Smith's suspension from school for one term is a harsher punishment than he was likely to receive from either a state court for conviction on or after April 9, 1974, or a federal court, for a first-time offense of simple possession of marijuana. Under federal provisions, 21 U.S.C. Sec. 844(b)(1), and state provisions which became effective on April 9, 1974, M.C.L.A. Sec. 335.347 (Supp. 1975–1976), the sentencing court has broad discretion to place such a first-time offender on probation for one year and, if the terms of the probation are not violated, to discharge the person and dismiss the charges without adjudication of guilt. The policy of the United States and the State of Michigan is that,

6. To discipline is "to penalize for the sake of discipline, regularity, order, or rule as . . . to punish or penalize in any way often . . . by loss of privileges . . . ." Webster's Third New International Dictionary 645 (1963).

except in extraordinary circumstances, simple possession of marijuana as a first offense is not so serious an offense as to warrant severe punishment, but is best treated by leaving the offender in society without serious social disability other than close supervision. In suspending Smith, the College forecloses further progress toward a degree at its institution for a substantial period, evicts him from his lodgings, exiles him to the streets in a time of substantial unemployment, and otherwise separates him from his normal society. The College apparently believes such a substantial disruption of the offender's life serves its special purposes, but it is contrary to legislative guidelines established for similar cases, and is a harsher penalty than what is usually inflicted by the courts.

On the whole, the court finds that on January 30, 1974, the plaintiff Smith was in the same position as a person suspected of a criminal offense, and that the search and seizure in question were as hostile and intrusive as the typical policeman's search for a seizure of the instrumentalities of crime in a person's home. The court finds no factors which would render this a less hostile or more benign "administrative" search.

Referring to Stipulated Issue No. 5, the College contends that, assuming the College's room search regulation was constitutional and reasonable, Smith, in living in a campus dormitory room which he rented from the College, waived objections to any reasonable searches of his room conducted pursuant to the College search regulation. The Residence Hall Contract which Smith signed provided that residence in the dormitory was subject to all the College regulations.

The court has difficulty understanding the issue and contention as stated. If the College regulation and the search were both constitutional and reasonable, it would make no difference whatsoever whether Smith consented or not. Furthermore, it is stipulated that the search in question was without consent, and consent is indistinguishable from waiver in this context. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

 The court assumes the College is contending that by signing the contract Smith waived objections, or consented, to any search conducted in accordance with the College regulation, even if the search did not otherwise comply with the Fourth Amendment. Smith had knowledge of the College regulation, and if the only issue was Smith's subjective expectation of privacy, then the regulation and the contract would foreclose his objections here. However, the test is a "reasonable" expectation of privacy, which necessarily adds an objective element. A person's expectation of privacy might be objectively too low if, for example, he had no expectation of privacy at all because of the authorities' announced intention to ignore the Fourth Amendment.

 This problem really belongs to the law of unconstitutional conditions. The state cannot condition attendance at Grand Valley State Colleges on a waiver of constitutional rights. Robinson v. Board of Regents of Eastern Kentucky University, 475 F.2d 707 (6th Cir. 1973). It follows that the College cannot suspend a student for a term on the basis of the fruits of a search conducted pursuant to just such a required waiver. Furthermore, a blanket authorization in an adhesion contract that the College may search the room for violation of whatever substantive regulations the College chooses to adopt and pursuant to whatever search regulation the College chooses to adopt is not the type of focused, deliberate, and immediate consent contemplated by the Constitution. Accordingly, the court finds that the plaintiff Smith has not waived his Fourth Amendment right of privacy or his right to object to the violation thereof. The regulation and search in question must stand or fall apart from the residency contract. Cf., Piazzola v. Watkins, 442

F.2d 284 (5th Cir. 1971); Commonwealth v. McCloskey, 217 Pa.Super. 432, 272 A.2d 271 (1970).

The College contends it is an institution having "special characteristics" which justify the regulation and search in question. Healy, supra, 408 U.S. at 180, 92 S.Ct. 2338. The College advances a general proposition that regulations which are essential to the maintenance of order and discipline on school property are constitutionally reasonable even though such regulations infringe on outer limits of constitutional rights, citing Burnside v. Byars, 363 F.2d 744, 748 (5th Cir., 1966); Moore, supra, 284 F.Supp. at 730. The College argues that the search regulation is essential to the maintenance of order and discipline on the campus, and that the search conducted pursuant to that regulation was accordingly reasonable within the meaning of the Fourth Amendment. The theory is that the special characteristics of the College defeat or seriously qualify whatever expectation of privacy the student might have in other contexts or vis-a-vis other social institutions.

 This court rejects the theory that College officials acting pursuant to regulations may infringe on the outer limits of an adult's constitutional rights. Burnside and Moore, upon which the College relies, were decided before Tinker, supra, which rejected the proposition that students "shed their constitutional rights . . . at the schoolhouse gate." 393 U.S. at 506, 89 S.Ct. at 736. The Fourth Amendment is flexible enough to meet a variety of public needs, but it will not admit of slight infringements. Boyd, supra, 116 U.S. at 635, 6 S.Ct. 524. Nor does the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983, under which the plaintiffs sue here, permit slight infringements. As the United States Court of Appeals for the Fourth Circuit recently stated, "There is no warrant for any separation of constitutional rights into redressable rights and non-redressable rights, of major and minor unconstitutional deprivations, and

Section 1983 makes no such distinction and authorizes no such separation." Pritchard v. Perry, 508 F.2d 423, 425 (4 Cir. 1975). Finally, as noted above, Smith's interest in the privacy of his room is not at the "outer limits" but at the core of the Fourth Amendment.

The basic question is the extent of the College's supervisory power in relation to the Fourth Amendment. Conclusory statements about the College's need for order and discipline are not enough. There is no challenge to the substantive drug regulation; the issue is the means of enforcement. There are a variety of means, but each actually used must be consistent with constitutional limitations. "In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students." Tinker, supra, 393 U.S. at 511, 89 S.Ct. at 739.

 The College is unjustifiably claiming extraordinary powers. The College drug regulations track federal and state laws, yet the College contends that its interests are so important that it may use means of enforcement—warrantless police searches on less than probable cause—which are not available to either the federal or state governments. Indeed, the College is claiming that its drug regulations are more important than the domestic security of the United States, which will not justify such action as the College took here. Cf., United States v. United States District Court, supra. Since nearly all college students in Michigan are adults, the College cannot have such a high interest in maintaining strict discipline as elementary and secondary schools. The College is also unlike military or quasi-military organizations, where the need for discipline is more acute than in civilian society. See Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

The College has not established that the search regulation is essential to the enforcement of the drug laws and regula-

tions on campus. There are other ways of enforcing the regulations than with midnight warrantless police searches. Where persons are using or selling marijuana openly so as to provoke complaints from dormitory residents, the alleged offender may be charged and the complaining witnesses may testify against him or her. Indeed, that is what happened in the case of the plaintiff Smyth. Another alternative is for the College to secure a search warrant, as set forth below.

Similarly, the College has not established that obedience to the drug laws and regulations is so crucial to the performance of its educational function that extraordinary means of enforcement must be allowed. Possession and use of alcohol are certainly no less foreign to education than possession and use of marijuana. Yet the possession and use of alcohol in the dormitories are permitted by the College. Student Handbook at 14–15. Mr. Douglas Ballard, Resident Advisor of Smith's dormitory, and the College official in the best position to know the practical effects of failure to comply with the College drug regulations, agreed that he was not concerned with any student conduct which did not in fact bother him or other students in the dormitory. College Hearing, Tr., at 233. If anyone is the victim of purely private possession and use of marijuana, it is not the College, the other students, or the educational function.

While the College has an important interest in enforcing drug laws and regulations, and a duty to do so, it does not have such special characteristics or such a compelling interest as to justify setting aside the usual rights of privacy enjoyed by adults.

On the basis of the foregoing, the Court concludes that the plaintiff Smith

had a reasonable expectation of freedom from official intrusion into his dormitory room and that therefore the Fourth Amendment applies to this case. It remains to determine more precisely what the Amendment requires.

■ The College regulation in question allows a search of dormitory rooms when "College officials have *reasonable cause* to believe that students are continuing to violate federal, state or local laws or College regulations . . . ." (Emphasis added.) Following Moore, supra, the College defines "reasonable cause" as more than mere suspicion but less than probable cause.[7] Apart from the Warrant Clause, the issue is whether "reasonable cause" is a constitutionally adequate standard. Limited warrantless searches on less than probable cause are allowed under certain circumstances. Terry, supra. But the type of chance street encounter and limited search at issue in Terry has little in common with the police search of a dormitory room at 12:45 A.M. according to a plan drawn in advance. Although "school regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedure," Esteban, supra, 415 F.2d at 1090, people enjoy Fourth Amendment rights of privacy whether a formal criminal prosecution is brought or not. Nor can it be argued that the standard of "probable cause" is too technical for the College to administer. The standard of "reasonable cause" is no less technical than that of "probable cause." But the "probable cause" standard is not too technical in any event. As the Supreme Court has said, the probabilities with which we deal in the area of probable cause "are not technical; they are the factual and practical considerations of everyday life on which reasonable and

---

7. The use of "reasonable cause" to mean something less than "probable cause" is an anomoly in Michigan search and seizure law. The statute authorizing magistrates to issue search warrants requires that the magistrate be "satisfied that there is reasonable or probable cause therefor . . . ." M.C.L.

A. Sec. 780.651. "Reasonable cause" is routinely interpreted by Michigan courts to mean "probable cause." Israel, "Legislative Regulation of Searches and Seizures: The Michigan Proposals," 73 Mich.L.Rev. 222, 226 n. 13 (1975).

prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). College administrators, faculty, and advanced students have more formal education than many law enforcement officials who routinely operate successfully under the "probable cause" standard.

The only possible justification for requiring less than probable cause for a search of an adult student's lodging, whether with or without a warrant, is that the student's interest in privacy is somehow less than that of other adults; or that the College's interest in enforcing laws and regulations is somehow greater than that of the community. But these contentions have already been rejected.

The court concludes that the failure of the College regulation to require that there is "probable cause" to justify a room search renders the regulation constitutionally invalid.

The search in question was conducted by campus police officers who were also Ottawa County deputy sheriffs and by school officials without a warrant. The plaintiff contends that a warrant was required. The College contends that the search warrant procedure is "out of place" on the college campus, and contains seriously objectionable features in the college setting. The College assumes that a requirement of a search warrant would necessarily mean that the school authorities would have to call the off-campus police in order to obtain a search warrant, and that students would be prosecuted in the formal criminal process.

The Supreme Court recently observed,

"[T]he very heart of the Fourth Amendment directive: [is] that, where practical, a governmental search and seizure should represent the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that *the collected evidence is sufficient to justify invasion of a citizen's private prem-*

*ises . . .*. Inherent in the concept of a warrant is its issuance by a 'neutral and detached magistrate.' Coolidge v. New Hampshire, supra, 403 U.S. [443] at 453 [91 S.Ct. 2022 at 2031, 29 L.Ed.2d 564] (1971); Katz v. United States, supra, 389 U.S. [347], at 356 [88 S.Ct. 507, at 514, 19 L.Ed.2d 576] (1967). The further requirement of 'probable cause' instructs the magistrate that baseless searches shall not proceed.

". . . The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. Katz v. United States, supra, at 359–360 [88 S.Ct. 507, at 515–516] (Douglas, J., concurring). But those charged with this investigative and prosecutorial duty should not be the sole judges of when to use constitutionally sensitive means in pursuing their tasks." United States District Court, supra, 407 U.S. at 316–317, 92 S.Ct. at 2136. (Emphasis added.)

 The defendants in this case have consistently emphasized the extent to which they have the duty to enforce College regulations. They are plainly executive officers charged with investigation and prosecution, and certainly used constitutionally sensitive means in this case—*a warrantless police search of an adult's room on less than probable cause*—to accomplish their purpose. They are thus not "neutral and detached magistrates" who may authorize searches within the contemplation of the Fourth Amendment.

 Nonetheless, the College officials claim sole and uncontrolled discretion to determine when "reasonable cause" exists to believe that laws or regulations are being violated, and to authorize a search on this basis. *All* of the protections characterized by the Supreme Court as being at the very heart of the Fourth Amendment are dispensed

with. In this case, no written record was made in advance warranting such cause as did exist. There was no way to know whether those who performed the search were acting under proper authorization, or what the lawful limits of the search were. See Camara, supra, 387 U.S. at 532, 87 S.Ct. 1727. The fact that the College did not bring formal criminal charges does not serve as a substitute for a warrant. Cf., United States District Court, supra, 407 U.S. at 318–320, 92 S.Ct. 2125.

■ The College insists that in order to obtain a search warrant, it must invoke the formal criminal process, including the outside police. In the absence of constitutionally adequate procedures for securing a proper warrant, the College cannot search an adult's room for contraband, but must take its evidence to the off-campus police and leave the matter in their hands. However, there are possible alternative procedures which may be constitutionally adequate and which the College perhaps ought to explore.

Although the court does not presume to definitively interpret Michigan statutes, the court observes that the Michigan search warrant provisions, M.C.L.A. Sec. 780.651 et seq., do not on their face limit the issuance of search warrants to situations in which criminal prosecutions are contemplated. There is no limitation on who may apply for a warrant, and no reason is perceived why College officials might not do so. Any warrant which is issued must be "directed to the sheriff or any peace officer." M.C.L.A. Sec. 780.654. Campus police officers are deputy sheriffs and are certainly "peace officers" within the meaning of the statute. Such a "peace officer" was among those who searched Smith's room. There is no requirement that any evidence seized be turned over to the off-campus prosecutorial authorities, see M.

C.L.A. Sec. 780.655, unless, of course, the Attorney General should bring an action for forfeited contraband, M.C.L. A. Sec. 600.4541. Nor is there any requirement of which the court is aware that the subject of a search warrant be criminally prosecuted after the successful execution of a warrant. After the trial, if any, contraband is to "be disposed of under the direction of the court or magistrate." M.C.L.A. Sec. 780.655.

Whether or not the College officials and campus police are eligible to apply for search warrants under existing Michigan statutes, the College may consider requesting the legislature for a special statute explicitly entitling them to secure a search warrant from a civil magistrate. Responsible Michigan authorities are studying the possibility of adopting new search and seizure statutes, and this area may profitably be included. See Israel, supra, 73 Mich.L. Rev. 221 ff.

The College might also explore the possibility of a warrant procedure internal to the institution. The Constitution requires that a search warrant be issued by a magistrate who is neutral and detached. If the All College Judiciary is competent to try violations of College regulations, it may be competent to issue search warrants which are sufficient for College purposes alone, although the court does not decide this point here.[8]

■ Securing a warrant to search a student's room, whether from a civil magistrate or from the College judiciary, means some inconvenience to the College officials. However, this is not an inconvenience to be weighed against the claims of administrative efficiency, Coolidge, supra, 403 U.S. at 481, 91 S.Ct. 2022; United States District Court, supra, 407 U.S. at 315, 92 S.Ct. 2125, and is an inconvenience justified in a free society to protect the constitutional val-

---

8. Although the "probable cause" standard is not excessively technical, and although a finding of probable cause is essentially a finding of fact, it may be that a lay All Col-

lege Judiciary is not an adequate "magistrate," considering the fundamental and sensitive nature of Fourth Amendment rights.

ue of privacy, United States District Court, 407 U.S. at 321, 92 S.Ct. 2125, which adults who happen to be students share in equally with other citizens.

Securing a search warrant in advance is not without important collateral benefits. The record of the College hearing in this case, which was directed only toward the question of whether or not the College complied with its own regulations, demonstrates the difficulty of establishing "reasonable cause" for a search by after the fact testimony alone. A prior affidavit and warrant build a record, establish the presumptive validity of the search, and minimize the burden of justification in post-search hearings. A proper warrant minimizes the possibility or scope of collateral attacks on constitutional grounds in federal or state courts.

The College contends that Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L. Ed.2d 408 (1971), provides authority for the College's warrantless search of Smith's room. In that case, the court held that New York could terminate AFDC benefits for the refusal of a beneficiary to permit a home visit by a caseworker after written advance notice specifying the date of the proposed visit had been delivered. But the instant case is vastly different from Wyman. The visit in Wyman was not forced or compelled, and welfare visits are not police searches in the constitutional sense, id. at 317–18, 323, 325, 91 S.Ct. 381. Here, there was a focused police search for evidence that Smith was "out of compliance with an asserted governing standard," id. at 324, 91 S.Ct. at 389. Smith, being absent from his room when the search was initiated, had no opportunity to refuse to allow the search, in contrast to the welfare recipient in Wyman. Moreover, the welfare visit was

preceded by several days' notice, and could be conducted only during working hours. Here, there was no advance notice, and the search was conducted after midnight. Wyman is simply inapposite.

▉ The court concludes that under the circumstances presented here, the defendants were constitutionally required to get a search warrant from a neutral and detached magistrate before searching Smith's room, and the failure of the defendants to secure such a warrant renders the search and seizure unreasonable and constitutionally invalid. The failure of the College regulation to require a warrant in the absence of exigent circumstances renders the regulation constitutionally invalid.[9]

The final problem is whether an exclusionary rule applies in this case. The parties have not briefed this question separately, but much that they say goes to this issue. The court might hold that the evidence seized from Smith's room by the College authorities, although seized in violation of his constitutional right of privacy, was admissible in the College disciplinary hearing whether or not it would be admissible in a formal criminal proceeding.

In Weeks, supra, the Supreme Court for the first time held that the Fourth Amendment barred the use of evidence secured through an illegal search and seizure in a federal prosecution. In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) the court held that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.

In Mapp the Court emphasized that "the purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incen-

---

9. The requirements of the Warrant Clause may vary according to the governmental interest to be enforced and the nature of the citizen's rights deserving protection. United States District Court, supra, 407 U.S. at 323, 92 S.Ct. 2125. For the reasons stated

above, the court concludes that the College authorities must satisfy the usual standard of probable cause in order to justify the issuance of a warrant to search an adult student's room for the purpose of discovering the fruits or instrumentalities of crime.

tive to disregard it.' Elkins v. United States, supra, 364 U.S. [206], at page 217 [80 S.Ct. 1437, at page 1444, 4 L. Ed.2d 1669] (1960)." 367 U.S. at 656, 81 S.Ct. at 1692. In United States v. Calandra, supra, the Court stated that the exclusionary "rule is a judicially-created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." 414 U.S. at 348, 94 S.Ct. at 620. To determine whether the exclusionary rule applies in a given case, it is necessary to weigh the injury to governmental interests and institutions against the potential benefits of the application of the rule. Id. at 349, 94 S. Ct. 613. In Calandra, the Court determined that illegally seized evidence could be used as a basis for grand jury questions. The fact that the prosecution could not use illegally obtained evidence at a criminal trial was deemed to be a deterrent to illegal police conduct, and the exclusion of the evidence or the fruits thereof from a grand jury proceeding was deemed to have no significant additional deterrent effect.

■ If there were no exclusionary rule in this case, the College authorities would have no incentive to respect the privacy of its students. Students do not normally have the means to maintain a protracted damage action. In addition, those whose rights are violated cannot recover damages except from those who acted in bad faith. See Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L. Ed.2d 214 (1975). Where, as here, the authorities who violated the Constitution were not demonstrably guilty of bad faith, the exclusionary rule remains the only possible deterrent, the only effective way to positively encourage respect for the constitutional guarantee. This conclusion is consistent with, and perhaps required by, Calandra, supra, which was premised upon the availability of an exclusionary rule applicable to the authorities' case in chief, as well as

the genuine possibility of recovery in a damage action.

In One 1958 Plymouth Sedan, supra, the Supreme Court held the exclusionary rule applicable to a "quasi-criminal" forfeiture proceeding, observing, "It would be anomalous indeed . . . to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible. [Footnote omitted.] That the forfeiture is clearly a penalty for the criminal offense and can result in even greater punishment than the criminal prosecution has in fact been recognized by the Pennsylvania courts." 380 U.S. at 701, 85 S.Ct. at 1251. In this case, the court has found that Smith is in the same position as a criminal defendant; proof that the College regulation has been violated requires proof that the criminal law has been violated; and the punishment in fact imposed by the College is more severe than that likely to be imposed by any state or federal court for the same offense. It would thus be anomolous here, too, not to apply an exclusionary rule.

In addition, the College hearing officer suppressed the evidence against Smyth because the College did not comply with its regulations. It would be anomolous too to hold that an exclusionary rule does not apply when the College fails to comply with the Constitution of the United States, but does apply when the College fails to comply with its own regulations. The Constitution is of higher dignity than a College regulation, and ought to provide at least equal protection.

The application of an exclusionary rule to College disciplinary hearings where the College authorities have seized evidence in violation of Fourth Amendment rights will preserve the integrity and thus the legitimacy of the College as the maker and enforcer of regulations. Institutions which enforce

the law should not infringe upon fundamental constitutional rights in doing so. As Mr. Justice Brandeis said, *"Our government is the potent, omnipresent teacher. . . . If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."* Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928). (Emphasis added.) If all Government is an omnipresent teacher, so also most certainly and more immediately is a College in relation to its students. In part for this reason, *"[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."* Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). (Emphasis added.)

The court concludes that the evidence seized in the illegal search of Smith's room could not be used against him in the College disciplinary proceedings. Accordingly, the College must retry him, without the evidence, or dismiss the charges.

Stipulated Issue No. 4 is as follows: "Assuming that a search without warrant upon reasonable cause was proper, did college officials have such reasonable cause to believe plaintiff Smith was violating laws or regulations so as to comply with the College's own regulations in making the subject search as required by the due process provisions of the Fourteenth Amendment?"

■ Although Section 1983 "does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings," Wood v. Strickland, 420 U.S. 308, 309, 95 S.Ct. 992, 994, 43 L.Ed.2d 214 (1975), the court has ancillary jurisdiction to hear this question on the stipulations of the parties. However, because

of the holding in Stipulated Issue No. 3, it is unnecessary to decide the issue at this time.

Stipulated Issue No. 6 is as follows: "Does the state college regulation regarding searches of rented dormitory rooms, pursuant to which the instant search was undertaken, operate to deny equal protection of the laws guaranteed by the Fourteenth Amendment to plaintiffs and other dormitory students living on campus, where the said regulation does not apply to students who live off campus?"

Because of the holding on Stipulated Issues 3 and 5, the court does not have to decide this issue.

### III.

■ Stipulated Issues 7, 8 and 9 related to the hearing given Smith[10] and Smyth on the College's charge against them. Stipulated Issue No. 7, which will be discussed first, is as follows: "Do the college disciplinary convictions of the plaintiffs for infractions of college regulations on the basis of a 'substantial evidence' standard of proof rather than a 'beyond a reasonable doubt' standard operate to deprive plaintiffs of liberty or property without due process of law contrary to the Fourteenth Amendment?"

The statement of the issue by the parties is not satisfactory. There are more possible standards of proof than "substantial evidence" and "beyond a reasonable doubt." In addition, the plaintiffs in their Brief do not argue strongly for a "beyond a reasonable doubt" standard, but contend that the "substantial evidence" standard is meaningless, confusing, prejudicial, and tantamount to no standard at all. The defendants had an opportunity to meet the plaintiffs' argument in their Reply Brief, and pointed out that the Stipulated Issue does not

---

10. Perhaps because of the court's holding on Stipulated Issues 3 and 5, the due process question perhaps need not be reached as to Smith at this time. However, the College has the option to retry Smith, and the court has the authority to render a declaratory judgment without awaiting retrial.

focus upon the validity of the "substantial evidence" standard alone.

■ The court need not be confined within the bounds of an inadequately constructed statement of issues. See Katz, supra, 389 U.S. at 350, 88 S.Ct. 507. The parties are apprised of the scope of the legal problem presented, and have addressed the major sub-issues in their briefs.

The Due Process Clause plainly applies here, and requires some sort of hearing. Goss v. Lopez, supra. The College does not appear to contest this proposition, and in fact gave an extensive hearing.

■ The nature of the required hearing will depend upon an appropriate accommodation of competing interests involved. Goss v. Lopez, supra, 419 U.S. at 579, 95 S.Ct. 729. The College's interest is in enforcing order and discipline toward the end of fulfilling its primary function of educating students. Whatever direct educational value inheres in punishing adults for the infraction of College regulations is not significantly different from the direct educational value which inheres in society's punishment of adults for the infraction of criminal laws.

■ The plaintiffs' property and liberty interests are implicated here. The plaintiffs have not established their property interests with specificity. It is not clear from the record whether, in the absence of academic difficulties or social discipline, the student working toward a degree has a legitimate entitlement to re-enroll for additional terms until his degree is completed. Nor does the record show whether a student who is suspended in mid-term forfeits all or part of his tuition. However, it has been said that the right of students in good standing to remain at college "is an interest of extremely great value." Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (5th Cir. 1961). It can be inferred from the Student Handbook that a suspended student is evicted from this dormitory room, which is certainly a significant deprivation of a property interest.

The liberty interest of each of the plaintiffs is perhaps more strongly implicated. In Goss, supra, the Supreme Court stated:

"The Due Process Clause . . . forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the clause must be satisfied. Wisconsin v. Constantineau, 400 U.S. 433, 437 [91 S.Ct. 507, 510, 27 L.Ed. 2d 515] (1971); Board of Regents v. Roth, supra, 408 U.S. [564], at 573 [92 S.Ct. 2701, at 2707, 33 L.Ed.2d 548] (1972). School authorities here suspended appellees from school for periods of up to 10 days based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment. [Footnote omitted]" 419 U.S. at 578, 95 S.Ct. at 736.

The Congress has recently recognized the extreme importance of a student's "record" by closely regulating the circumstances under which student records may be released by school authorities. Family Educational Rights and Privacy Act of 1974, as amended, 20 U.S.C.A. Sec. 1232g (1 New Laws and Court Constructions, Feb. 1975.)

In this case, each plaintiff was formally charged with "disorderly conduct and possession of narcotic drugs in violation of both State of Michigan laws and/or Grand Valley State Colleges regulations (Pages 20–21, *1973–74 Student Handbook*)," Stip.Ex.No. 8, and was convicted. A conviction for "possession of narcotic drugs" in violation of state criminal laws and/or College regulations is plainly an extremely serious attack upon a person's good name and reputation. The College has taken action to

ensure that the fact of the conviction and the reasons therefor are not communicated to anyone without the consent of the student involved. However, in our credentialed society, an individual wishing to transfer to another school, to attend graduate school, or to find a job with responsibility and possibility for advancement has no choice but to provide any information which prospective schools or employers request. Under these circumstances, the disciplinary conviction must be revealed by the applicant or by the College at the applicant's request. This is perfectly illustrated by the situation of the plaintiff Smith. He is considering applying to law school and has requested applications from about thirty-five institutions. Smith testified in a deposition that a majority of these inquired as to whether he had a disciplinary record. He submitted application forms as examples. While the form of the questions varied somewhat, the question asked by the University of Arizona School of Law was perhaps typical: "16. a. Were you ever dropped, suspended, expelled or disciplined by any school or college? b. Have you ever been convicted of any crime other than a minor traffic offense? If your answer to either of the above questions is 'yes,' explain fully on a separate page." Pl.Ex. 3.

This case is among the most serious ever likely to arise in a college context. In the interest of order and discipline, the College is claiming the power to shatter career goals, and to make advancement in our highly competitive society much more difficult for an individual than it already is. This is simply not the case of spiking the punch at an after-school meeting, Wood v. Strickland, supra, or a 10-day suspension on undifferentiated charges, Goss v. Lopez, supra, or of other minor infractions of College regulations such as pets or visitors in the dormitory.

It is in light of the high stakes involved that the Court must determine whether a standard of proof is required by the Due Process Clause, and if so, whether the "substantial evidence" standard is constitutionally adequate. The court concludes that at least where an adult student is charged by a College with committing an act which is a crime, the Due Process Clause requires that some articulated and coherent standard of proof be formally adopted and applied at the college hearing which determines the student's guilt or innocence of the charge.[11] If such a standard is not adopted and applied, then the college hearing board is totally free to exercise its prejudices or to convict for the purpose of vindicating "order and discipline" rather than on the evidence presented. All the rest of the procedural guarantees become or threaten to become meaningless as even a well-intentioned hearing board is adrift in uncertainty over the measure of persuasion to be applied.[12] That there be an articulated and coherent standard of proof is all the more crucial to fundamental fairness where, as in the college context, there are few constitutional or practical limitations on the nature of evidence which may be admitted against the accused.

In this case, the chairperson of the All College Judiciary which heard the Smith and Smyth cases originally ruled that the College would have to prove its charges "beyond a reasonable doubt" since the charge was "equal to a criminal sanction." College Hearing, Tr. at 9. The chairperson thought that trial by this standard was "the fairest

---

11. The court is not here relitigating evidentiary questions, and does not reach or decide the question of whether the evidence adduced at the College hearing was sufficient to convict either plaintiff. The only issue here is what the specific constitutional guarantee of the Due Process Clause requires.

See Wood v. Strickland, supra, 420 U.S. at 526, 95 S.Ct. 992.

12. The problem is not one of imposing excessively technical requirements on a lay board. One standard of proof is as technical as another. Lay juries apply the usual civil and criminal standards without difficulty.

way." Id. Subsequently, the attorney for the College moved the Judiciary to adopt a standard of "substantial evidence" on the grounds that this was what the Student Handbook provided. Id. at 93–96. The Judiciary granted the motion. Id. at 97. The College's "Due Process" Rule 14 states, "No disciplinary action shall be taken on grounds which are not supported by substantial evidence." Student Handbook at 35.

The first problem with the "substantial evidence" standard is that it is, standing alone, primarily a formula intended for appellate review of trial courts' determinations or judicial review of administrative determinations. Trial courts and administrative agencies have functions different from appellate and reviewing courts. Trial courts and administrative agencies have the original task of resolving conflicts in the evidence and between opposing interpretations. An appellate or reviewing court, in contrast, has the task of determining only whether the trial court or administrative body had a rational basis for its decision. The appellate or reviewing court does not conduct a trial de novo, and resolve conflicting views a second time. See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). A standard appropriate for a reviewing court to apply to determine whether there is a minimal rational basis for decision is not appropriate for an original trier of fact to resolve conflicts in the evidence and between opposing interpretations.[13] The issue before the trier of fact is not whether there is a minimal basis for conviction or whether a conviction would survive appeal or collateral attack. See Jaffe, "Administrative Law: Burden of Proof and Scope of Review," 79 Harv.L.Rev. 914, 915 (1966).

The substantial evidence formula standing alone as a standard of proof for the trial court provides no measure of persuasion or degree of proof to guide the court in resolving conflicts to reach its ultimate decisions, but goes only to the quantity of evidence required by the prosecutor. Cf. Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 281–284, 87 S.Ct. 483, 17 L. Ed.2d 362 (1966). Under the College's rule, the College need only present a certain quantum of evidence (substantial) that a party was guilty as charged, and the All College Judiciary could convict, regardless of what else appeared in evidence. The College attorneys explained the test to the All College Judiciary in terms of a wholly one-sided "quantum of proof." College Hearing, Tr. at 93. There is no express requirement that the Judiciary consider the whole record or all the evidence.[14] It may be that in other contexts a "substantial evidence" rule implies a "preponderance of the evidence" standard of proof which is understood and applied by trained hearing officers and expert administrative agencies, 5 U.S.C. Sec. 556(d); Woodby, supra, 385 U.S. at 288 & n. 1, 87 S.Ct. 483 (Clark, J., dissenting), but the court cannot assume that this lay Judiciary knew or understood or applied the principle. Indeed, no one can know what the Judiciary might have conceived the proper measure of persuasion to have been, for none was ever stated, except

13. In the cases cited by the defendants in which federal courts examined school disciplinary actions for due process violations, each court applies the rule that the disciplinary board's actions had to be supported by substantial evidence. Speake v. Grantham, 317 F.Supp. 1253 (M.D.Miss.1970), aff'd 440 F.2d 1351 (5th Cir. 1971); Jones v. State Board of Education, 407 F.2d 834 (6th Cir. 1969); Esteban v. Central Missouri State College, 290 F.Supp. 622 (W.D.Mo.1968), aff'd. 415 F.2d 1077 (8th Cir. 1969), cert. denied 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed. 2d 548 (1970); see also, Keene v. Rodgers, 316 F.Supp. 217 (D.Me.1970). Each of these courts was stating the rule on appeal or review or collateral attack. None was stating an original standard of proof, although the Speake court did say that the standard was not "beyond a reasonable doubt." 317 F.Supp. at 1283.

14. Compare the federal Administrative Procedure Act. 5 U.S.C. Sec. 556(d).

for the "beyond a reasonable doubt" standard which was ultimately rejected.

"Substantial evidence" has been defined as enough evidence "to justify, if the trial were to a jury, a refusal to direct a verdict," N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). Assuming this definition embodies an intelligible standard of proof for a trier of fact, that standard is too low. The application of any standard lower than a "preponderance of evidence" would have the effect of requiring the accused to prove his innocence. Under the circumstances of this case, at least, it would be fundamentally unfair to shift the burden of proof to the accused.

The Court concludes that the College's "Due Process" Rule 14 in the 1973–74 Student Handbook which states, "No disciplinary action shall be taken on grounds which are not supported by substantial evidence" is constitutionally inadequate as a standard of proof because it provides no intelligible standard of proof to guide the All College Judiciary, or because, to the extent that it might embody an intelligible standard, that standard is totally one-sided and is lower than that constitutionally required.

Because the convictions of both Smyth and Smith by the All College Judiciary were based upon constitutionally inadequate standards of proof, the suspensions in accordance with these convictions cannot be enforced.

The court need not and does not reach the question of precisely what standard of proof would be constitutionally adequate under the circumstances of this case. The court is certain that the standard cannot be lower than "preponderance of the evidence." However, given the nature of the charges and the serious consequences of conviction, the court believes the higher standard of "clear and convincing evidence" may be required.[15] The "clear and convincing" standard is well below the criminal standard which the College hearing officer thought would be the "fairest" to apply in these cases. The "clear and convincing" standard would be consistent with the general proposition that "school regulations are not to be measured by the standards which prevail . . . for criminal procedure," Esteban, supra, 415 F.2d at 1090, and would not be so strict a requirement as to cripple the disciplinary process. Cf., Goss, supra, 419 U.S. at 580, 95 S.Ct. 729. The court recommends that the College give serious consideration to adopting the "clear and convincing" standard for future cases.

Stipulated Issue No. 8 is as follows: "Was the plaintiff Craig Smyth deprived of liberty or property without procedural due process of law by being subject to state college disciplinary proceedings resulting in suspension: (a) without adequate notice of the date or circumstances of the alleged offense; (b) without the introduction into evidence of the allegedly illegal substance; (c) without any competent evidence that the substance alleged to have been in his possession was marijuana?"

Stipulated Issue No. 9 is as follows: "Was the plaintiff Greg Smith deprived of liberty or property without procedural due process of law by being subjected to state college disciplinary proceedings, resulting in suspension: (a) without ad-

15. In Woodby, supra, the Supreme Court held that no deportation order may be entered unless it is found by clear, unequivocal and convincing evidence that the facts alleged as ground for the deportation are true. In the case of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court held that proof beyond a reasonable doubt is among the essentials of due process and fair treatment required during the adjudicatory stage of a juvenile delinquency proceeding when a juvenile is charged with an act which would constitute a crime if committed by an adult. Although the juvenile's physical liberty was at stake, the Court emphasized also the element of stigma which attaches upon conviction. Id. at 363–364, 90 S.Ct. 1068.

equate notice of the date or circumstances of the alleged offense; (b) without any competent evidence that the exhibit introduced against him was marijuana?"

The court believes that, in light of its ruling on the other issues in this case, it is not necessary to rule upon the sufficiency of the notice.

■■■ In the hearings before the All College Judiciary, the plaintiffs were given the opportunity to cross-examine all witnesses and otherwise to challenge their credibility or to suggest that their testimony was not entitled to great weight. Because it is a lay body, the All College Judiciary cannot be expected to administer highly technical rules concerning the "competency" of evidence, and the Due Process Clause does not require it to do so.

### IV.

The court has several final parenthetical observations.

While the price of enforcing serious College regulations through internal procedures simply cannot be the sacrifice of fundamental constitutional rights normally enjoyed by adults, the court agrees that it is good policy to handle these matters internally as far as possible. The established Grand Valley State Colleges' procedures are on the whole adequate, and for this the College is to be complimented. The additional constitutional requirements set forth in this Opinion can be met with very little additional administrative cost, and, if the proper procedures are followed, with no sacrifice in the effectiveness of "law enforcement."

The students of Grand Valley State Colleges and other institutions are cautioned that nothing in this Opinion is intended to countenance the possession, use, or distribution of drugs of any sort. Nor should students take the decision in this case as some sort of license for the possession and use of drugs. It is very easy for the College to comply with the constitutional requirements in the future, or simply to call in the off-campus police. The possession and use of drugs remains illegal, and is a highly risky affair for all who choose to indulge.