El Pueblo de Puerto Rico, apelado, *v.* Ángel Ríos Colón, acusado y apelante.

*Número:* CR-88-42 *Resuelto:* 28 de junio de 1991

74

*Carmen Ana Rodríguez Maldonado, Margarita Gómez Vázquez, Rolando Hernández Rodríguez, Enrique Rivera Mendoza y Mark Anthony Bimbela,* abogados del apelante; *Norma Cotti Cruz, Subprocuradora General, y Ricardo E. Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Ordenamos la celebración de un nuevo juicio contra el apelante por considerar que el registro y la incautación realizados por la Sra. Norma I. Rivera Candelario —promotora del Centro Diamantino adscrito al Cuerpo de Voluntarios al Servicio de Puerto Rico— fueron irrazonables a la luz de los hechos que surgen de los autos. Estos hechos tampoco dan fundamento para la aplicación de la doctrina de evidencia a plena vista como justificación para tal registro e incautación.[1]

## I

La Sra. Norma Iris Rivera Candelario era Promotora de Desarrollo Humano del Centro Diamantino, adscrito al Cuerpo de Voluntarios al Servicio de Puerto Rico, en el Barrio Martín González de Carolina. El 13 de mayo de 1987, alrededor de las seis de la tarde (6:00 P.M.), la señora Rivera Candelario, en compañía de la Sra. María Isabel del Valle y uno de los voluntarios, realizaba una "ronda de cotejo" para verificar qué cantidad de voluntarios quedaba en el Centro Diamantino para el fin de semana *e informarle "un total al comedor".* La realización de la ronda de cotejo era una de las funciones de las promotoras del Centro Diamantino.

---

[1] Son los hechos, sin duda, los que activan las normas de derecho aplicables y no a la inversa.

Como parte de la ronda, llegaron las Promotoras Rivera Candelario y del Valle frente a la habitación que en ese momento el joven Ángel Ríos Colón (el apelante) ocupaba junto a otros dos (2) voluntarios. *La puerta de la habitación estaba cerrada.* La señora del Valle, sin tocar, sin identificarse ni anunciar el propósito de su entrada, abrió la puerta de la habitación.([2]) La señora Rivera Candelario pudo observar, entonces, al apelante sentado en una silla con lo que aparentaba ser una caja de zapatos en las manos. Observó que el joven ocultó algo debajo de la cama y que en las manos *aparentemente* tenía unos papelitos blancos y algo color marrón. Para ella *"aparentaba* ser marihuana", ya que "ella había observado cigarrillos de marihuana en unos adiestramientos que tomó en el Departamento de Servicios contra la Adicción [D.S.C.A.] durante dos días en el 1985, como parte de su práctica como Supervisora de Trabajo Social". E.N.P., pág. 3. Admitió en el contrainterrogatorio que *"no sabía lo que era, pero aparentaba" ser marihuana.* (Énfasis suplido.) Íd., pág. 4. Admitió, además, que en el curso que tomó en el Departamento de Servicios contra la Adicción mediante grabaciones y películas, *"no palpó ningún tipo de droga ilegal" y "no tenía información de si Angel Ríos Colón [el acusado] utilizaba drogas o no".* (Énfasis suplido.) Íd.

En voz baja, la señora Rivera Candelario le informó a la señora del Valle lo que había observado y ésta procedió a pedirle al apelante, y a los otros dos (2) jóvenes que se encontraban con él en la habitación, que se levantaran y se sacaran lo que contenían sus bolsillos, Luego le pidieron al apelante que sacara lo que había ocultado debajo de la cama. Éste procedió a hacerlo y a colocar la caja de zapatos sobre la cama. Negó en todo momento que la caja fuese

---

([2]) En el contrainterrogatorio la señora Candelario atestó que "quien abrió la puerta no fue ella, que fue la señora María Isabel del Valle, y que no tocó la puerta, simplemente entró ...".

suya, alegando que le pertenecía a otro joven que en ese momento se encontraba de "pase".

La señora del Valle cargó la caja de zapatos hasta su oficina y allí procedió a llamar a la Directora del Centro Diamantino, la señora Olmo. Ésta dio instrucciones para que se llamara a la policía y así se hizo. A la media hora llegó el policía Robles y procedió a ocupar la evidencia. Luego de llevarla a la División de Drogas y Narcóticos y practicarle los análisis de rigor, se encontró que, en efecto, el contenido de la caja era picadura de marihuana.

El apelante fue acusado de posesión de sustancias controladas y, encontrado culpable de los cargos, se le sentenció a cumplir dos (2) años de presidio.

Estos hechos son los que activan las normas que constitucionalmente protegen a todos los ciudadanos de esta sociedad contra registros y allanamientos que, como norma general, se presumen irrazonables cuando, como aquí, se realizan sin la garantía de una orden judicial previa de allanamiento. Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1; *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984). Veamos.

## II

Examinemos el derecho que se activa con la ocurrencia de estos sucesos.

■ Estamos frente a una inspección administrativa rutinaria donde se descubre evidencia utilizable en un proceso penal. *Pagán Hernández v. U.P.R*, 107 D.P.R. 720, 746 (1978).[3] Es de aplicación, pues, la garantía constitucional contra los allanamientos, los registros y las incautaciones irrazonables dispuesta en el Art. II, Sec. 10 de la Constitu-

---

[3] No estamos prejuzgando, por no estar presente ante nos, la admisibilidad de la evidencia ocupada en un procedimiento administrativo para expulsar al estudiante del programa. Véase *Smyth v. Lubbers*, 398 F. Supp. 777 (D. Mich. 1975).

ción del Estado Libre Asociado de Puerto Rico, *supra*. Véase *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988). Este artículo, en lo pertinente, dispone:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> . . . . . . . .
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse. Const. E.L.A., *supra*, ed. 1982, pág. 299.

Los valores centrales protegidos por dicha garantía son la intimidad del ser humano y su dignidad innata. *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979). *Cf. Camara v. Municipal Court*, 387 U.S. 523, 528 (1969). Adicionalmente, esta garantía ampara sus documentos y pertenencias e interpone la figura del juez entre los funcionarios del Estado y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión. *E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 207; *Pueblo v. Dolce*, 105 D.P.R. 422, 429–431 (1976). Dicha protección carecería de valor si no tuviese como corolario fundamental el que todo registro, allanamiento o incautación que se realice sin orden judicial previa es irrazonable *per se* (*E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 207), y la evidencia así ocupada no podrá ser utilizada en ningún proceso criminal contra el sujeto objeto del registro y del allanamiento. Nuestra Constitución, a diferencia de la Constitución federal, expresamente así lo establece. Const. E.L.A., *supra*.

La Constitución reconoce que frente al Estado, organizado por ella, esa intimidad se la reservan los ciudadanos del cuerpo político como elemento indispensable a su individualidad y libertad. En esa zona sacra sólo prevalece, y debe prevalecer, la reglamentación autoimpuesta por la

conciencia y el orden valorativo del individuo, excepto cuando intereses públicos de mayor jerarquía estén presentes y requieran urgente atención.

■ El aumento en el crimen y/o en el trasiego de drogas, así como la política pública en contra de dichos males no son, por sí solas, justificaciones suficientes para flexibilizar estas garantías constitucionales bajo cuyo manto quedamos cobijados todos los puertorriqueños. La democracia no se sostiene con la adopción de métodos antidemocráticos. La solución a tales males no es, pues, la derogación de facto de dichas garantías, puesto que existen medios razonables, legales y constitucionales para lidiar con los mismos. *Pueblo v. Lebrón*, 108 D.P.R. 324, 327–328 (1979); *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988).

## III

■ El Cuerpo de Voluntarios al Servicio de Puerto Rico (en adelante Cuerpo de Voluntarios) es un programa gubernamental, adscrito a la Oficina del Gobernador, 18 L.P.R.A. sec. 1413, creado "para ayudar en la erradicación del alto grado de desempleo que impera actualmente en Puerto Rico, mediante la creación de *oportunidades de estudio, adiestramiento, trabajo y desarrollo personal para los jóvenes puertorriqueños*". (Énfasis suplido.) 18 L.P.R.A. sec. 1412. Véase, además, 18 L.P.R.A. sec. 1415. Sus dos (2) orientaciones básicas son las siguientes:

En primer lugar, deberá organizar y desarrollar un programa vasto e innovador de *actividades de formación del carácter y capacitación técnico-vocacional para el desarrollo integral de la juventud más necesitada del país* que, desde talleres, campamentos, fincas u otros centros o recintos operacionales de estudio, trabajo y servicios, prepare a la juventud, tanto para el autoempleo por medio de pequeños negocios y cooperativas, como para el trabajo productivo remunerado en organizaciones y empresas, privadas y públicas. El Programa *desarrollará actividades de educación, adiestramiento*, trabajo y servicios en

los más diversos campos del quehacer humano, a los fines de crear nuevas fuentes de empleo en la manufactura, la agricultura, el comercio, la construcción, los servicios de mantenimiento y reparación, y cualquier otra fase de la actividad económica.

En segundo lugar, desarrollará un amplísimo programa de obras, servicios y acción comunal por los jóvenes participantes donde éstos contribuyan con su esfuerzo y trabajo a resolver problemas y mitigar necesidades de la comunidad en general, y en especial, de los grupos más necesitados, con el propósito de que obtengan, no sólo experiencias de trabajo, sino también conciencia de responsabilidad cívica, personal y social. A estos fines se incorporarán recursos y esfuerzos de otras entidades gubernamentales o cívicas, particularmente de aquéllas sin fines de lucro. (Énfasis suplido.) 18 L.P.R.A. sec. 1412.

El Cuerpo de Voluntarios es, pues, un programa *eminentemente educativo* en el área vocacional. La ley que lo crea define al joven participante del modo siguiente:

(h) *"Joven voluntario* o participante" significará cualquier ciudadano residente en Puerto Rico *entre las edades de dieciséis (16) a veintinueve (29)* años que se acoja a los beneficios del Programa como aprendiz o asistente para recibir adiestramiento, educación, empleo o servicios. (Énfasis suplido.) 18 L.P.R.A. sec. 1414(h).

Para ingresar como participante en el programa, el joven aspirante debe:

(a) *Haber cumplido los dieciséis (16) años pero no los veintinueve (29) años de edad* al momento de alistarse en el Programa.

(b) *Requerir adiestramiento o readiestramiento avanzado o de tipo especializado que le facilite una oportunidad real de conseguir empleo en el mercado de trabajo.*

(c) *Requerir educación, adiestramiento y orientación para poder obtener y mantener un empleo significativo,* participar con éxito en *programas de educación regular* o cualificar para otros programas de adiestramiento.

(d) Tener las aptitudes y aspiraciones necesarias para completar y obtener los beneficios y servicios del Programa, y no padecer de problemas médicos o sicológicos de tal severidad que le impidan *cumplir con los requisitos de conducta, disciplina,*

*trabajo y participación con éxito en las actividades de grupo que exija el Programa.*

(e) *Satisfacer cualquier otro requisito o condición que por reglamento se disponga y comprometerse a cumplir con todas las reglas y normas del mismo.*

Con sujeción a los requisitos básicos antes mencionados, el Director establecerá por reglamento criterios de elegibilidad y permanencia, así como los procedimientos de admisión y cesación de los diferentes componentes individuales del Programa, en consulta con el Consejo Interagencial y el Consejo Asesor de Ciudadanos.

En la medida que sea posible, el Director podrá adoptar por reglamento las normas y guías de selección de solicitantes a través de consultas con entidades y organizaciones, tales como grupos profesionales o laborales, agencias públicas de empleo, u organismos de acción comunal e individuos que tengan contacto con jóvenes por un período sustancial de tiempo.

Ningún joven será seleccionado como participante a menos que exista una posibilidad razonable de que dicho joven participará con éxito en actividades de grupo, *y se comportará en una forma compatible con el buen funcionamiento del Programa.*

En la selección de los participantes del Programa, no podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas.

Tampoco podrá discriminarse contra un joven físicamente impedido por razón de su condición cuando ésta no constituya una limitación para participar en las actividades del Programa. (Énfasis suplido.) 18 L.P.R.A. sec. 1432.

En el Reglamento Interno de Jóvenes Voluntarios Participantes del Cuerpo de Voluntarios al Servicio de Puerto Rico (en adelante Reglamento) de 3 de septiembre de 1986, adoptado por el Director Ejecutivo del programa, se dispuso las reglas y normas de conducta y disciplina que debían observar los participantes. En lo aquí pertinente, se dispuso:

15. Conducta Impropia: La conducta que realiza un *Joven Voluntario* Participante en violación de las normas de este Reglamento y/o de las normas que se dicten al amparo del mismo y/o de las normas y reglamentos de EL CUERPO y/o del personal

del Recinto. (Énfasis suplido.) Art. III(15) del Reglamento, pág. 3.

■ Como uno de los deberes del participante está "[e]l cumplimiento de las leyes del Estado Libre Asociado de Rico y del Gobierno de los Estados Unidos de América". Art. V(4) del Reglamento, pág. 4.

■ El Art. VI(A)(a) del Reglamento, pág. 5, dispuso como conducta intolerable que conlleva la *suspensión sumaria* del Cuerpo de Voluntarios:

> (a) el uso, posesión, transportación u ocultación, dentro o fuera del recinto, de narcóticos o estupefacientes prohibidos por las leyes del Estado Libre Asociado de Puerto Rico; y la posesión o uso de armas de fuego, o de cualquier naturaleza, prohibidas por ley ....

Es incuestionable que el Centro Diamantino,[4] adscrito al Cuerpo de Voluntarios, tiene el poder inherente y en ley para promulgar y poner en vigor normas para regular su funcionamiento, la disciplina en el programa y la conducta de los participantes con el fin de mantener un ambiente educativo propicio para el logro de los fines y objetivos que, como política pública, se ha trazado el programa. No cabe duda de que el programa va dirigido a que sus participantes se adhieran a las normas razonables de conducta y disciplina adoptadas. Más aún, los empleados y funcionarios[5] del Centro Diamantino tienen la facultad de poner

---

[4] Este centro es un recinto del Cuerpo de Voluntarios al Servicio de Puerto Rico (en adelante Cuerpo de Voluntarios). El recinto se define como "[c]ualquier instalación, ... taller, finca, campamento, *residencia*, escuela, institución o [facilidad] de cualquier naturaleza de EL CUERPO, donde se adiestren, trabajen o estudien, o de cualquier forma participen, los *Jóvenes Voluntarios Participantes*". (Énfasis suplido.) Art. III(12) del Reglamento Interno de Jóvenes Voluntarios al Servicio de Puerto Rico (en adelante Reglamento) de 3 de septiembre de 1986, pág. 2.

[5] El Art. 8 de la Ley del Cuerpo de Voluntarios al Servicio de Puerto Rico, 18 L.P.R.A. sec. 1431, dispone que:

"*Sec. 1431. Organización del Programa*

"En el plano organizacional, los componentes del Programa consistirán de las siguientes categorías básicas:

en vigor tales normas y de ejecutar sus deberes siempre que tal ejercicio de poderes, deberes y facultades sea compatible con las garantías constitucionales fundamentales que le asisten a sus supervisados. No hay duda de que eliminar el uso o tráfico de drogas en la institución es un fin legítimo que aquí no se cuestiona. Sólo está en controversia el *medio* utilizado en este caso en particular para lograr tal fin.

 Aun cuando aceptáramos que en el caso de autos se trata de un registro realizado por una funcionaria del Estado,[6] cosa que no estamos haciendo —Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Pueblo v. Velazco Bracero*, 128 D.P.R. 180 (1991)— en un centro educativo, al cual acuden a recibir enseñanza vocacional jóvenes de 16 a 29 años provenientes de los sectores económicamente menos privilegiados de nuestra sociedad, por el mero hecho de que estos estudiantes se sometan volunta-

---

"(1) funcionarios, empleados y otro personal asalariado o por contrato;

"(2) personas voluntarias, no consideradas como participantes, que ofrezcan sus servicios al Programa, sujetos a lo dispuesto en la sec. 1434 de este título, y

"(3) los *Jóvenes Voluntarios* o participantes que se alisten al Programa a los niveles de aprendiz o de asistente y que reciban los servicios de educación, adiestramiento, trabajo o servicios de orientación." (Énfasis suplido.)

El Reglamento crea la figura del "Promotor del Desarrollo Humano" como el funcionario encargado de recibir los informes de incidentes relacionados con la implantación del Reglamento. Art. III(7) del Reglamento, *supra*.

(6) Si los promotores del Cuerpo de Voluntarios son funcionarios públicos para propósitos de la Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, *quaere*. Sólo a los fines de la argumentación y para patentizar la irrazonabilidad del registro en el caso de autos, presumimos que estos funcionarios actuaban como agentes públicos, sin que se entienda que como cuestión de hecho o de derecho actuaban como tales; que podían intervenir con los participantes del programa si tenían motivos fundados para creer que éstos habían violado las reglas de la institución. *Cf. Pueblo v. Velazco Bracero*, 128 D.P.R. 180 (1991). De no ser así, tendrían que tener certeza de la comisión de un delito para intervenir. Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. *Cf. People v. Fierro*, 236 Cal.App.2d 344 (1965) (el gerente de un motel se consideró un oficial del Estado para el registro de naturaleza criminal realizado en un cuarto del motel); *O Connor v. Ortega*, 94 L.Ed.2d 714, 480 U.S. 709 (1987) (los registros y allanamientos realizados por los patronos o supervisores del Gobierno en la propiedad privada de los empleados públicos están sujetos a las restricciones de la Cuarta Enmienda).

riamente a ese programa y a sus normas disciplinarias no significa que se les despoje de sus derechos constitucionales al llegar a las puertas de la institución.(7) Aun a los confinados le hemos reconocido la protección contra registros y allanamientos irrazonables, puesto que al pagar su deuda con la sociedad tras las rejas no dejan atrás su dignidad como seres humanos ni su derecho a la intimidad. *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986). ¿Cuánto más no se le debe reconocer a quien permanece en la libre comunidad? El propio reglamento del Cuerpo de Voluntarios reconoce como uno de los derechos de los participantes el que "se respeten sus libertades fundamentales como persona". Art. IV(2) del Reglamento, pág. 3.

Así que al revisar cualquier intervención estatal de los funcionarios del Centro Diamantino debe balancearse el interés de estos estudiantes en mantener un espacio vital de intimidad, y que se les garantice su dignidad como seres humanos, con el interés de las autoridades del centro en mantener la disciplina, las normas y el ambiente educativo propicio para lograr su política pública, fines y objetivos. *Cf. Moore v. Students Affairs Committee of Troy State Univ.*, 284 F. Supp. 725 (D. Ala. 1968).

Debemos entrar, pues, en el campo de la razonabilidad de la intervención a la luz de los hechos y de las circunstancias del caso. *Cf. Piazzola v. Watkins*, 442 F.2d 284, 287 (5to Cir. 1971). Para determinar si un registro es razonable debemos considerar si:

(a) En su origen, la intervención con la persona en el lugar que sería registrado estuvo justificada. Aquí debemos examinar la expectativa razonable de intimidad del intervenido en el lugar donde se encontraba y si la funcionaria

---

(7) Cualquier requisito del programa que obligue a estos estudiantes a renunciar a sus derechos constitucionales como condición para ser participantes queda sujeto a la doctrina de las condiciones inconstitucionales. *Morales Morales v. E.L.A.*, 126 D.P.R. 92 (1990); M. Ramírez Lavandero, *La doctrina de las "condiciones inconstitucionales" en Puerto Rico*, 12 (Núm. 1) Rev. Jur. U.I.A. 111, 120 (1977); *Dickey v. Alabama State Board of Education*, 273 F. Supp. 613, 618 (D. Ala. 1967); *Moore v. Student Affairs Committee of Troy State Univ.*, 284 F. Supp. 725, 729 (D. Ala. 1969).

del Estado tenía motivos fundados para intervenir, y si su presencia en el lugar dónde se encontraba la persona que sería registrada estaba justificada.([8])

(b) Una vez superada esa justificación inicial, debemos examinar si el alcance o la amplitud del registro (como se condujo) estaba razonablemente relacionada con las circunstancias que justificaron la intervención en primer lugar. Tal registro no puede ser excesivamente intrusivo en la persona que es registrada.([9]) Aunque muchas veces sea difícil entenderlo, el resultado del registro no prueba su razonabilidad ni convalida una intervención ilegal o irrazonable de los funcionarios del Estado con los ciudadanos —*Pueblo v. Martínez Torres*, supra; *Pueblo v. González Rivera*, 100 D.P.R. 651 (1972)— pues "[e]n nuestro país la Constitución y las leyes no solamente protegen al ciudadano modelo, sino también al infractor ... [y] todo acusado tiene derecho a la presunción de inocencia ... aunque se le sorprenda in fraganti". *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 503–504 (1982).

Este es el análisis que debe seguirse en estos casos. *Cf. New Jersey v. T.L.O.*, 469 U.S. 325 (1985).

## IV

Debemos preguntarnos: ¿Tenían justificación las oficiales gubernamentales para entrar a la habitación que compartía el acusado con otros dos (2) estudiantes, sin llamar a

---

([8]) El concepto de "motivos fundados" se ha definido como aquella información o conocimiento que lleva a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito, independientemente de que luego se establezca o no la comisión del delito. Véase *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988).

En este contexto, los motivos fundados se refieren a la creencia razonable de que el registro arrojará evidencia de que el estudiante violó o está violando la ley o las reglas de la institución.

([9]) En este contexto, la razonabilidad de la intrusión con el estudiante se debe medir a la luz de la edad, del sexo, de su historial en la escuela, de la naturaleza de la supuesta infracción cometida por él, del tipo de problema que enfrenta la escuela, de la oportunidad de previamente obtener una orden y de la existencia de una confidencia, así como de la confiabilidad de la información dada por el confidente. *Cf. Interest of L.L.*, 280 N.W.2d 343 (1979).

la puerta que permanecía cerrada? Creemos que no. ¿Tenía el apelante una expectativa razonable de intimidad en su dormitorio cerrado? Resolvemos que sí la tenía.

▮ Para determinar si la persona que es registrada tendría una expectativa razonable de intimidad, deben considerarse los criterios siguientes:

1. El lugar registrado o allanado.
2. La naturaleza y el grado de intrusión de la intervención policíaca.
3. El objetivo o el propósito de la intervención.
4. Si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad.
5. La existencia de barreras físicas que restrinjan la entrada o la visibilidad al lugar registrado.
6. La cantidad de personas que tienen acceso legítimo al lugar registrado.
7. Las inhibiciones sociales relacionadas con el lugar registrado.

Véanse: *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991); *Pueblo v. Lebrón*, supra; *Katz v. United States*, 389 U.S. 347 (1967); Wilkins, *Defining the Reasonable Expectation of Privacy*, 40 Vand. L. Rev. 1077, 1128 n. 3; J.A. Bush and R. Bly, *Expectation of Privacy Analysis and Warrantless Trash Reconnaisance after Katz v. United States*, 23 (Núm. 3) Ariz. L. Rev. 283, 288 n. 26 (1981).

▮ *La habitación* del hogar de todo individuo en nuestra sociedad representa el corazón mismo de su intimidad, el resguardo de su individualidad. Como reconocimos en *Torres v. Rodríguez*, 101 D.P.R. 177, 178 (1973), uno de los valores más preciados de la vida civilizada es "la vivienda, que sin ser fastuosa, sea tranquila, serena y agradable; el hogar en el cual el ser humano busca tranquilidad espiritual y física luego de un día gastado en la lucha económica de la sociedad industrial contemporánea". Tras la puerta de una habitación se resguarda el espacio vital necesario para estar con uno mismo en libertad. Es

donde el individuo puede estar solo, consigo mismo y con su conciencia, en silencio y en paz, luego de un día ajetreado, lleno de ruidos y distracciones, pues "[e]l vértigo de la vida moderna deja libres muy pocos momentos para la reflexión sin la cual no habrá un cabal entendimiento de las libertades. [Ú]nicamente el hogar brinda esos momentos de serenidad en que además de partir el pan con los suyos pueda el hombre encauzar su existencia y la de su familia entre lo conocido y lo arcano que nos ofrece la vida. Sin esas oportunidad[es] para la serenidad y la reflexión que van reduciéndose paulatinamente ... la libertad de pensamiento se torna en burla, y sin libertad de pensamiento no puede existir una sociedad libre. No concebimos derecho de posición preferente a la libertad de estar y sentirse tranquilo en su casa". (Escolios omitidos.) *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20, 22–23 (1974). Enorme es, pues, la expectativa de intimidad de un individuo dentro de la habitación de su hogar. Mucho mayor es tal expectativa cuando la puerta de la habitación está cerrada, pues ese hecho demuestra que los ocupantes de la misma no desean la intervención de terceros. La puerta cerrada es la afirmación por excelencia del derecho individual a estar protegido en la intimidad. *Cf. Pueblo v. Luzón*, 113 D.P.R. 315, 326 (1982).

La habitación de un participante del programa del Cuerpo de Voluntarios tiene, para propósitos prácticos, características *que la asemejan* al dormitorio de su hogar. Allí, el participante habita, estudia, medita y pernocta durante cinco (5) días de la semana, a veces siete (7), mientras termina su preparación académica. Allí tiene derecho a abrigar una expectativa razonable de que su intimidad se respete, y de estar y sentirse tranquilo. Claro está, ello no niega que la habitación del participante de este programa, así como de otros programas educativos, pueda estar sujeta a reglamentación válida en conformidad con la natu-

raleza, los fines, los propósito y la forma de funcionar de la institución. Sin embargo, esa reglamentación debe ser razonable, esto es, de su faz y en su implantación no puede interferir incisiva, caprichosa o arbitrariamente con la expectativa razonable de intimidad del participante, según configurada por los criterios objetivos y subjetivos antes señalados, en las circunstancias particulares del caso.

Así, puede haber reglamentación institucional válida que permita la intervención de los funcionarios de la institución dentro de las habitaciones para garantizar la limpieza y salubridad, la seguridad, el orden y la disciplina, etc., ya que se trata de una habitación que *no es exactamente la del hogar*. Pero, cualquier intervención de los funcionarios del programa, a tenor con dicha reglamentación válida de su faz, queda sujeta al criterio de razonabilidad en su implantación. Ello, para protección de la expectativa razonable de intimidad del participante.

En síntesis, un participante del Cuerpo de Voluntarios abriga una expectativa razonable de intimidad en las habitaciones de dicho recinto pues, aunque no es exactamente una extensión del dormitorio de su hogar, participa de características que lo asemejan. Por no ser el dormitorio de su hogar y por tener la institución un válido interés en su reglamentación, las habitaciones del programa pueden estar sujetas a normas válidas que permitan la intervención de los funcionarios de la institución para fines legítimos siempre y cuando de su faz sean razonables y en su implantación éstos actúen razonablemente.

La expectativa razonable de intimidad en este caso queda reflejada, además, por las circunstancias personales del participante. Este es un estudiante adulto (21 años de edad) cuya expectativa de intimidad es igual a la de cualquier adulto en su hogar, apartamento o cuarto de hotel. *Cf. Smyth v. Lubbers*, 398 F. Supp. 777 (D. Mich.

1975). Subjetivamente, no existe ninguna diferencia. *Commonwealth v. McCloskey*, 272 A.2d 271 (Pa. 1970).([10]) Estos jóvenes, por su madurez, no requieren una supervisión tan incisiva como la requerida por los estudiantes de los grados primarios dentro de su ambiente educativo.([11]) *Cf. New Jersey v. T.L.O.*, supra. De suerte, que el interés de la institución en cumplir con sus deberes rutinarios o en mantener la disciplina no justifica una supervisión rigurosa o cuasi militar sobre estos jóvenes. *Cf. Smyth v. Lubbers*, supra, págs. 785–786; *Keene v. Rodgers*, 316 F. Supp. 217, 220 (D. Me. 1970).

En el caso de autos, el mero hecho del cotejo rutinario no facultaba a la promotora a entrar sin tocar a la puerta, identificarse y exponer el propósito de su entrada. La autorización estatutaria para un registro o la deseabilidad de actuar por sorpresa están supeditadas a la regla general de irrazonabilidad de un registro sin orden. *E.L.A. v. Coca Cola Bott. Co.*, supra; *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978); *Pueblo v. Malavé González*, supra.

*Conforme a los criterios antes esbozados (pág. 19), aquí el apelante tenía una expectativa razonable de intimidad.* La autorización reglamentaria, si alguna, para realizar el cotejo rutinario no facultaba a los funcionarios gubernamentales a entrar a las habitaciones que estuvieran cerradas *sin antes tocar a la puerta, sin identificarse y*

---

([10]) El aquí apelante fue procesado y juzgado como adulto por violación a la Ley de Sustancias Controladas de Puerto Rico.

([11]) La situación de autos es análoga a los registros realizados en los dormitorios de instituciones universitarias. Sobre este tema confróntese a W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 3, Sec. 10.11(c); Armstrong, *College Searches and Seizures: Privacy and Due Process Problem on Campus*, 5 Crim. L. Bull. 537 (1969); R.J. Bacigal, *Warrantless Search of a College Dormitory*, 7 Akron L. Rev. 422 (1974); Bible, *The College Dormitory Student and the Fourth Amendment: A Sham or a Safeguard*, 4 U.S. Fla. Rev. 49 (1969); R. Delgado, *College Searches and Seizures: Students, Privacy, and the Fourth Amendment*, 26 (Núm. 1) Hastings L.J. 57 (1974); Nota, *Search and the Single Dormitory Room*, 77 (Núm. 6) Mich. L. Rev. 1540 (1979).

*sin exponer el propósito de su entrada.* Es lo mínimo que toda persona en esta sociedad demo crática hace antes de traspasar el umbral de una puerta.([12]) Más aún en este caso, ¿por qué no tocar a la puerta de estos estudiantes, identificarse y exponer el propósito de su entrada si precisamente el fin de la ronda de cotejo era saber la cantidad de jóvenes que se habían quedado en sus cuartos para el fin de semana y así informarlo al comedor? No exigir ese mínimo sería asestarle un rudo golpe a la libertad que toda persona debe gozar en la intimidad de su habitación.([13]) Sostenemos, pues, que la manera en que aquí se realizó la llamada ronda de cotejo rutinaria interfirió irrazonablemente con el derecho a la intimidad del apelante. Registrar al apelante e incautarse de la droga en este caso, para eliminar su uso o trasiego en la institución, mediante la entrada irrazonable a una habitación cerrada resulta en el

---

([12]) Distinto sería el caso si, luego de tocar a la puerta, uno de los compañeros del apelante la hubiera abierto. En *Commonwealth v. McCloskey*, 272 A.2d 271 (Pa.1970), el Tribunal Supremo de Pennsylvania determinó que era irrazonable el registro con orden realizado por miembros de la Policía en unión a las autoridades universitarias en el dormitorio del apelante, porque dichos funcionarios procuraron la entrada a la habitación cerrada de éste mediante una llave maestra sin antes tocar a la puerta, sin identificarse y sin exponer el propósito de su entrada. La conducta observada por el Decano de la Universidad de Elmira en *People v. Haskins*, 369 N.Y.S.2d 869, 870 (1975), de tocar a la puerta, identificarse y exponer el propósito de su entrada, permitió a la Corte Suprema del estado de Nueva York validar el registro que éste hizo de la habitación de uno de los estudiantes de esa universidad.

([13]) Tampoco nos convence el argumento de que al pertenecer voluntariamente al Cuerpo de Voluntarios, institución cuyos fines van dirigidos al desarrollo integral del carácter de los jóvenes más necesitados, el acusado implícitamente consintió la intervención de los funcionarios gubernamentales que los supervisaban. La autoridad que le confiere las funciones del cargo a los supervisores no puede estar reñida con las garantías constitucionales que la propia institución debe salvaguardar a sus participantes. *Cf. Smyth v. Lubbers*, supra, pág. 785. La renuncia, si alguna, es insostenible. *Cf. Piazzola v. Watkins*, 442 F.2d 284 (5to Cir. 1971).

Además, acoger tal posición sería dejar en manos y a la discreción del funcionario público la protección y garantía del derecho a la intimidad del estudiante. Precisamente, la protección constitucional está para interponer la figura de un juez neutral que garantice mayor razonabilidad en la intervención que la que le puede garantizar dicho funcionario público interventor.

logro de un fin por medios injustificados. El fin no justifica los medios en nuestro sistema de gobierno.([14])

## V

En el caso de autos, los funcionarios que intervinieron en primer lugar también carecían de motivos fundados para creer que el apelante estaba involucrado en el trasiego o uso de drogas en la institución. El récord del apelante está carente de un historial *académico* que demuestre tal desviación de las normas disciplinarias institucionales. Tampoco hay evidencia de que la actuación fuera la respuesta a una confidencia. *Cf. Moore v. Student Affairs Committee of Troy State Univ.*, supra, pág. 728.

Aun cuando se justificara la intervención inicial, cosa que rechazamos, una vez observan al apelante no se cumple con los motivos fundados para intervenir sin orden de registro y de allanamiento ni los requisitos que configuran la excepción a la norma general bajo la doctrina de evidencia a plena vista. *Pueblo v. Dolce*, supra, pág. 436; *Pueblo v. Malavé González*, supra.

En primer lugar, ya examinamos que los funcionarios gubernamentales no tenían justificación previa para estar en el lugar desde donde hacen las observaciones, pues violaron la expectativa de intimidad del estudiante al abrir la puerta cerrada de su habitación sin previamente tocar a la puerta, identificarse y anunciar el propósito de la

---

([14]) Rechazamos que las motivaciones subjetivas de las funcionarias del Centro Diamantino sean relevantes en el análisis de la razonabilidad del registro. Aun cuando éstas actuaran guiadas por las más nobles motivaciones, las mismas no pueden ser utilizadas como justificación para violar los derechos constitucionales de estos estudiantes. Lo que nuestra Constitución protege es la expectativa de intimidad del individuo y ésta no puede quedar sujeta a las motivaciones subjetivas del agente interventor. Además, aun cuando el propósito original de esta funcionaria no fuese el registrar para encontrar drogas, el hecho cierto es que su actuación culminó en el procesamiento criminal del apelante.

entrada antes de entrar. En segundo lugar, la evidencia ocupada fue descubierta luego de registrar la caja de zapatos que el apelante mantenía cerrada debajo de su cama; no fue inadvertidamente. La primera percepción visual de la señora Rivera fue que el acusado *"aparentemente"* tenía en sus manos unos papelitos blancos y algo de color marrón que *"aparentaba* ser marihuana". El *expertise* de esta testigo se fundamentaba en una película que, en varias horas y durante dos (2) días, vio en 1985, o sea, dos (2) años antes de ocurridos estos hechos. En dicho entrenamiento nunca palpó físicamente drogas, ni parafernalia para su uso, de ningún tipo. *La mera sospecha nunca ha sido suficiente para apoyar la intervención con un ciudadano por parte de un funcionario del Estado.* Bajo tales circunstancias, resulta dudoso que la naturaleza delictiva de tales objetos surgiera de la simple observación de esta funcionaria. Esa declaración debía ser evaluada con especial rigor y sospecha. *Pueblo v. González del Valle*, 102 D.P.R. 374 (1974).

Pero más aún, una vez hecha la observación inicial, el registro fue tan amplio y extremadamente intrusivo que se extendió no sólo al apelante y a las pertenencias que cargaba, *sino que las funcionarias hurgaron en sus pertenecias personales y en las que cargaban sus otros compañeros.*

██ Sólo cuando existen circunstancias de emergencia se justifica la entrada al dormitorio de los estudiantes sin tocar, identificarse y anunciar el propósito de la entrada. *Morale v. Grigel*, 422 F. Supp. 988 (D. N.H. 1976); *Commonwealth v. McCloskey*, supra, pág. 273; W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 3, pág. 193. En tales casos, la evidencia delictiva, que a plena vista encontrasen en la habitación los funcionarios de la institución educativa, podría ser admitida en evidencia y

utilizada en un proceso criminal contra su poseedor. Aquí no existen tales circunstancias. *El cotejo era rutinario.*

En conclusión, bajo las circunstancias del caso de autos debió prevalecer el interés del apelante en que se respete su dignidad, intimidad y libertad en su dormitorio sobre el interés de la institución de instrumentar las reglas internas sobre cotejo rutinario de la forma en que fue realizada por estas funcionarias.

Por los fundamentos expuestos, *se revoca la sentencia apelada y se devuelve el caso al foro de instancia para la celebración de un nuevo juicio donde se encause al apelante por violación a la Ley de Sustancias Controladas de Puerto Rico una vez suprimida la evidencia fruto de este registro irrazonable. Pueblo v. Martínez Torres,* supra.[15]

El Juez Asociado Señor Rebollo López concurre con el resultado. El Juez Asociado Señor Negrón García disiente con opinión escrita.

$$-\text{O}-$$

Opinión disidente del Juez Asociado Señor Negrón García.

## I

Ángel Ríos Colón apela la sentencia de dos (2) años de reclusión que emitió el Tribunal Superior, Sala de Carolina (Hon. Carmen Celinda Ríos, Juez), por infracción al Art. 404 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404.

---

[15] El aquí apelante fue sentenciado a cumplir dos (2) años de prisión, *consecutivos con cualquier otra sentencia dictada,* el 22 de abril de 1988. Ya el 4 de febrero de 1988 el apelante había sido sentenciado a cumplir cuatro (4) años de prisión por el delito de robo, rebajado a tentativa. Aún está cumpliendo esa pena. El interés de verse liberado de la sentencia de dos (2) años por posesión de sustancias controladas es suficiente para emitir nuestros pronunciamientos en resguardo de las garantías constitucionales que cobijan a todos los ciudadanos de esta isla.

Como denominador común en sus dos (2) señalamientos,[1] cuestiona la admisibilidad de la evidencia fundamentándose en que fue el resultado de un registro ilegal.

Como los hechos son los que activan las normas de derecho aplicables, y no a la inversa, expongámoslos.

Los hechos ocurrieron en el Centro Diamantino situado en el Barrio Martín González de Carolina, perteneciente al Cuerpo de Voluntarios al Servicio de Puerto Rico. Esta organización gubernamental tiene como propósito desarrollar diversos programas y actividades para la formación del carácter y la capacitación técnica-vocacional de la juventud más necesitada. 18 L.P.R.A. sec. 1412 *et seq.*

El viernes 13 de marzo de 1987, la Sra. Norma I. Rivera Candelario —Promotora de Desarrollo Humano en el referido Centro— en horas de la tarde, procedió a entregar los pases correspondientes a los jóvenes que saldrían durante el fin de semana. Después, en unión a su compañera María I. del Valle, comenzó a realizar una *"ronda de cotejo"* por el área de los dormitorios para ver la cantidad de jóvenes que permanecerían, con el propósito de proveerles los servicios del comedor.

Oportunamente, en el descargo de esa tarea, abrieron la puerta y entraron en uno de los dormitorios ocupado por tres (3) jóvenes. Al entrar, la señora Rivera observó a Ríos Colón sentado en una silla frente a su cama con lo que aparentaba ser una tapa de caja de zapatos. Tan pronto el apelante las vio, procedió a ocultar algo debajo de la cama. La señora Rivera observó que en las manos tenía unos pa-

---

[1] Los expone así:

"A. Erró el honorable tribunal de instancia al declarar no ha lugar la moción de supresión de evidencia.

B. Erró el honorable tribunal de instancia al encontrar culpable al acusado con, una evidencia que es el producto de una intervención ilegal del Estado con el ciudadano aquí apelante. La acción del Estado est[á] en clara contravención con los estatutos constitucionales del Estado Libre Asociado de Puerto Rico y los Estados Unidos de América."

pelitos blancos y algo de color marrón que aparentaba ser marihuana.

Ante esta situación, les ordenó a los jóvenes —incluso al que dormía y al otro que veía televisión— que se pusieran de pie y sacaran lo que tuvieran en sus bolsillos. Asimismo, le ordenó a Ríos Colón que sacara lo que había debajo de su cama. Al éste hacerlo, ellas ocuparon el material y unas tijeras pequeñas. Un examen químico posterior de lo ocupado dio positivo de marihuana.

## II

Ante esa prueba, Ríos Colón argumenta que fue víctima de un registro ilegal e irrazonable. En su apoyo nos cita la doctrina jurisprudencial en torno a la protección contra ese tipo de registro consignada en el Art. II, Sec. 10 de nuestra Constitución, L.P.R.A., Tomo 1. Aduce que estamos ante una intervención gubernamental ilícita fundada en una simple sospecha en contravención con lo dispuesto en la Regla 12 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. A juicio suyo, no medió orden judicial previa de arresto, registro e incautación, como tampoco se configuró un registro incidental a un arresto legal. Finalmente, nos señala que se violó su expectativa de privacidad y que no podía aplicarse la doctrina de "plena vista" establecida en *Pueblo v. Dolce*, 105 D.P.R. 422 (1976). No tiene razón.

Todo análisis de controversia relacionado a la protección contra registros y allanamientos irrazonables exige, como requisito inicial, la determinación de la existencia de un registro. En ocasiones anteriores hemos aclarado que dicha determinación opera en función de la expectativa razonable de intimidad que albergue el ciudadano objeto de la intervención gubernamental. Así, en *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983), citando a *Pueblo v. Lebrón*, 108 D.P.R. 324, 331 (1979), aseveramos:

"La cuestión central es si la persona tiene un derecho razonable a abrigar, donde sea, *dentro de las circunstancias del caso específico*, la expectativa de que su intimidad se respete." (Énfasis suplido.)

Contrario a lo que sugiere la opinión mayoritaria, la garantía constitucional contra registros y allanamientos irrazonables protege a las personas y no a lugares específicos. *Pueblo v. Bogard*, 100 D.P.R. 565 (1972); *Katz v. United States*, 389 U.S. 347 (1967). De esta forma, el mero hecho de que la intervención se hizo en un dormitorio no la convierte *per se* en un registro. Es imprescindible el análisis de otras circunstancias. Nuestra ponencia en *Pueblo v. Rivera Colón*, 128 D.P.R. 672, 700–701 (1991), esbozó los criterios necesarios para la determinación de la existencia de una expectativa razonable de intimidad:

*Primero*, la persona debe haber *exhibido* una expectativa subjetiva de intimidad. Esta no es una simple reserva mental, sino que ha de estar acompañada de actos afirmativos que demuestren, inequívocamente, la intención de alojar dicha expectativa. *Segundo*, la expectativa demostrada por el individuo tiene que ser una que la sociedad reconozca como razonable. Desde su opinión disidente en *United States v. White*, 401 U.S. 745, 986 (1971), el Juez Harlan había señalado que en este subcriterio se debe "apreciar la naturaleza de la práctica en particular y el alcance de su impacto sobre el sentido de seguridad del individuo balanceado contra la utilidad de la conducta como técnica policíaca [*law enforcement*]". (Traducción nuestra.) De esta forma el criterio se autoregula y, lejos de ser estático, se ajusta a las necesidades sociales cambiantes. (Cita omitida.)

## III

Lo expuesto derrota la contención de Ríos Colón. Los hechos y las circunstancias particulares de la intervención de las señoras Rivera Candelario y del Valle no configuran un registro.

El Centro Diamantino no es un recinto cualquiera; está adscrito al Cuerpo de Voluntarios al Servicio de Puerto

Rico. Su función principal es adiestrar vocacionalmente a jóvenes indigentes y algunos que han tenido *problemas con la justicia*. En este sentido, forma parte de la estructura gubernamental encaminada a la rehabilitación vocacional. Parte de su matrícula se hospeda en dormitorios localizados dentro del centro. El adiestramiento va más allá de lo estrictamente vocacional. Gran parte de su programa está orientado al desarrollo de la personalidad de sus voluntarios. *Como es de esperarse, la disciplina es ingrediente indispensable en la educación de los participantes.*

Por ser la vida y la disciplina en los dormitorios un elemento tan crucial en la educación de los participantes, el Cuerpo de Voluntarios al Servicio de Puerto Rico tiene empleados que se desempeñan en funciones relacionadas con los dormitorios. La testigo señora Rivera Candelario ocupaba la posición *de Promotor de Desarrollo Humano.*

Como tal, estaba asignada a cotejar los dormitorios para, naturalmente, ayudar a los participantes del programa a adaptarse a la convivencia con otros jóvenes. Ese contacto directo requiere las inspecciones de limpeza y conteo de matrícula. Podemos caracterizar esas funciones como de enlace entre los dormitorios y el resto de la comunidad vocacional.

No puede, pues, afirmarse que Ríos Colón exhibió una conducta que demostrara su intención de albergar una expectativa de intimidad. Ríos Colón estaba llevando a cabo una actividad ilegal, *a plena vista*, en un dormitorio *que compartía* con otras personas que no estaban involucradas en dicha actividad. La puerta no estaba cerrada con seguro. La prueba estableció que el dormitorio estaba sujeto a unas rondas de cotejo, lo cual inferimos forma parte de la reglamentación interna que, entre otras, regula los horarios de levantarse y acostarse, y claro está, inspección diaria y verificación nocturna para mantener la limpieza y el orden en las habitaciones.

Ante este cuadro, ¿cómo puede la mayoría sostener que

los dormitorios del Centro Diamantino son similares a una habitación? Opinión mayoritaria, pág. 90. ¿Cómo equipar a los participantes del Centro Diamantino de las mismas libertades que retendría en su hogar? Íd. ¿Cómo resolver que existe idéntica expectativa de intimidad? Íd. ¿Cómo puede desnaturalizar y poner en jaque todo el programa y su imprescindible disciplina sosteniendo que por oscilar las edades de los estudiantes entre dieciséis (16) y veintiséis (26) años —jóvenes maduros— no se "justifica una supervisión rigurosa o cuasi militar ...". Íd., pág. 91.

## IV

Desde *Pueblo v. Dolce*, 105 D.P.R. 422 (1976), hemos reconocido que la incautación de evidencia a plena vista no requiere la obtención de una orden judicial previa. Véase W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 1, Sec. 2.2, pág. 240. Esta excepción goza de las garantías circunstanciales de confiabilidad que persigue el requisito de orden previa. *Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

Para validar este tipo de incautación es suficiente que concurran los requisitos siguientes:

1) El artículo debe haberse *descubierto por estar a plena vista* y no en el curso o por razón de un registro.

2) El agente que observe la prueba debe *haber tenido derecho previo a estar en la posición* desde la cual podía verse tal prueba.

3) *Debe descubrirse el objeto inadvertidamente.*

4) La naturaleza *delictiva* del objeto *debe surgir de la simple observación.* (Énfasis suplido y citas omitidas.) *Pueblo v. Dolce*, supra, pág. 436.

El hecho de que la evidencia haya sido descubierta por una empleada gubernamental que no llevaba a cabo funciones de mantener el orden público, no opera contra la

aplicación de la doctrina. El material delictivo puede ser incautado si se descubre a plena vista durante el curso de un registro administrativo válido. *Michigan v. Clifford*, 464 U.S. 287, 294 (1984).

## V

No se cuestiona persuasivamente que las funcionarias del Centro Diamantino, señoras Rivera Candelario y del Valle, penetraron al dormitorio ocupado por Ríos Colón y otros jóvenes en el descargo legítimo de sus funciones. Entraron a cotejar el número de jóvenes que usarían el servicio del comedor durante el fin de semana. En el desempeño rutinario de esa labor inherente a sus funciones administrativas, fue la señora Rivera Candelario quien observó a Ríos Colón en posesión de lo que, según su adiestramiento, eran cigarrillos de marihuana. El que su experiencia previa fuera limitada no desvirtúa esa percepción visual y tampoco derrota la apariencia de ilicitud del material encontrado.

Recapitulando, Ríos Colón propiamente no fue objeto de un "registro o allanamiento". *En las circunstancias en que fue sorprendido con la marihuana no poseía una expectativa de intimidad en el dormitorio común.* Y es que, al analizar lo ocurrido el 13 de marzo de 1987 en el Centro Diamantino, distinto a la contención de Ríos Colón, es manifiesto que la doctrina de prueba a plena vista es aplicable.

El análisis jurídico y racional "no puede sustituirse con una loa a la Carta de Derechos. No es cuestión de ser o no ser 'liberal', es cuestión de elaborar jurisprudencia de frente a la realidad". *Pueblo v. Tribunal Superior*, 91 D.P.R. 19, 45 (1964), opinión disidente del Juez Asociado Señor Rigau.

Dictaríamos sentencia confirmatoria.